Santosha SCARBOROUGH, Appellant,

v.

WINN RESIDENTIAL L.L.P./ATLANTIC TERRACE APARTMENTS, Appellee.

No. 05–CV–207.

District of Columbia Court of Appeals.

Argued Sept. 20, 2005.

Decided Jan. 12, 2006.

Nathan A. Neal, Supervising Attorney, D.C. Law Students in Court Program, with whom Ann Marie Hay, Executive Director, D.C. Law Students in Court Program, was on the brief, for appellant.

Frederick A. Douglas, Washington, with whom Margaret McFarland and Melinda Bolling, District of Columbia Housing Authority, and Monica E. Monroe, Philip Felts, and Lisa J. Dessel, were on the brief, for appellee.

Barbara McDowell, Julie H. Becker, Patricia Mullahy Fugere, Antonia K. Fasanelli, Amber W. Harding, Vytas Vergeer, and Rebecca Lindhurst filed a brief amici curiae on behalf of The Legal Aid Society of the District of Columbia, Bread for the City, and Washington Legal Clinic for the Homeless.

Kenneth L. Wainstein, United States Attorney, and Michael J. Ryan and Alan Burch, Assistant United States Attorneys, filed a brief amicus curiae on behalf of the United States.

Before FARRELL and REID, Associate Judges, and KING, Senior Judge.

FARRELL, Associate Judge:

Appellant Santosha Scarborough is a tenant of the Atlantic Terrace Apartments, a housing complex for which the federal government provides subsidized housing to tenants under HUD's Section 8 housing Moderate Rehabilitation ("Mod Rehab") Program, pursuant to 42 U.S.C. § 1437f. Following a trial, the Superior Court entered a judgment of possession in favor of Winn Residential L.L.P./Atlantic Terrace Apartments (collectively, "the Landlord") after finding that Ms. Scarborough had violated a condition of her lease that prohibits, under pain of lease termination, criminal activity on the premises that threatens the health, safety, or right to peaceful enjoyment of other tenants. Specifically, the court found that Scarborough was responsible for the presence in her apartment of a loaded 12–gauge shotgun that had been used in a fatal shooting there the previous day.

On appeal, Scarborough raises a series of issues, chief of which is that the judgment of possession is invalid because, before initiating the suit for eviction, the Landlord did not comply with D.C.Code § 42–3505.01(b) (2001) by giving her a "notice to correct the violation" within thirty days. We reject this argument because we conclude that the requirement of a notice and opportunity to correct (or "cure") as applied to criminal activity— such as possession of the loaded shotgun in this case—that endangers the safety or right to peaceful enjoyment of other tenants may not be imposed consistently with the federal statute and regulations governing appellant's tenancy. And because we reject appellant's other arguments as well, we affirm the judgment of possession.

I.

Scarborough has been a tenant of the Atlantic Terrace Apartments since 1999 under a lease requiring her to pay a fixed amount each month toward the market-based rent, with the balance paid to the

Landlord by way of a HUD Section 8 subsidy. Her lease, which was for an initial one-year period to continue month-to-month thereafter, includes a paragraph (no. 23) which states, among other things, that the Landlord may terminate the lease for four reasons: (1) material non-compliance; (2) material failure to carry out lease obligations; (3) criminal activity; and (4) other good cause.[1]

Evidence largely undisputed at trial established that on December 12, 2002, Scarborough's cousin, Delante Simmons, entered her apartment after he had been drinking and began an altercation with her. Scarborough's boyfriend, Desmond Barr, who was also present, withdrew a shotgun (from where it is not apparent) and fatally shot Simmons. Executing a search warrant for the apartment the next day, the police found a loaded twelve-gauge semi-automatic shotgun next to the water heater in the furnace room, a loaded semi-automatic pistol under the seat cushion of a couch, a box of Remington shotgun ammunition containing twenty-three shotgun shells, and a box of cartridges for the semi-automatic pistol. Barr was later acquitted of second-degree murder (the jury apparently accepting his claim of self-defense) but convicted of possession of an unregistered firearm and ammunition.

As a result of the shooting and the shotgun possession, the Landlord enlisted Karl Stevens, a professional process ser-

ver, to serve a Notice to Quit on Scarborough. Twice in February 2003, Stevens unsuccessfully tried to hand deliver the notice to her at her apartment. On February 15, 2003, he posted the notice on her apartment door and then went to the post office and mailed copies of the notice to her and the District of Columbia Department of Regulatory Affairs. The Notice to Quit stated:

> [Y]ou are in violation of your lease by endangering the health and safety of other residents by having a firearm on the premises. Specifically, on or about December 12, 2002 a homicide was committed on the apartment property. On that same date, members of the Metropolitan Police Department conducted a search of your apartment and located a gun which was believed to have been involved in the homicide. In any event, maintaining a gun on the property violates the terms of your lease, HUD regulations and is a crime in the District of Columbia.

The notice required Scarborough to vacate the premises by March 25, 2003. It did not provide her with an opportunity to cure the lease violation.

At trial on the Landlord's suit for possession, the judge first rejected Scarborough's contention that the written notice failed to apprise her adequately of the basis for the eviction.[2] He then rejected

---

1. Specifically, as relevant here, paragraph 23 provides that the Landlord "may terminate this Agreement ... for ... criminal activity that threatens the health, safety, or right to peaceful enjoyment of the premises by other tenants ... engaged in by a Tenant, any member of the Tenant's household, or any guest or other person under the Tenant's control."

2. Scarborough renews that argument on appeal, but we reject it. The notice met both District of Columbia and federal requirements for notice. It contained "a statement detailing the reasons for the eviction," D.C.Code

§ 42–3505.01(a), including "the factual basis on which the housing provider relie[d]." 14 DCMR § 4302.1(a) (2005). It likewise "specif[ied] the grounds for [termination]." 42 U.S.C. § 1437f(d)(1)(B)(iv). Although the notice did not expressly reference paragraph 23 of appellant's lease, it did inform her that the termination was for lease violations, and a cursory review of the lease would have led her to paragraph 23, the only one dealing with termination of the tenancy. Further, while it did not cite to specific criminal statutes alleged to be violated, the reference to

her argument that the notice was insufficient too by not giving her the thirty-day opportunity to correct the violation provided by D.C.Code § 42–3505.01(b). The judge assumed that by its terms this statute requires a notice to correct be given even where eviction is sought for dangerous criminal activity on the premises, but ruled that federal regulations governing Scarborough's tenancy "supersede[d]" District law in this regard and "preclude[d]" an opportunity to correct or cure in these circumstances. "[I]f there were a right to cure," the judge explained, "that would effectively gut the import of the federal regulations on this point, namely that endangering health and safety justifies a termination [for a violation] that cannot be cured."

## II.

■■■ D.C.Code § 42–3505.01(b), part of the District's Rental Housing Act first adopted by the Council of the District of Columbia in 1985, states that "[a] housing provider may recover possession of a rental unit where the tenant is violating an obligation of tenancy and fails to correct the violation within 30 days after receiving from the housing provider a notice to correct the violation or vacate." When applicable, compliance with this provision is necessary before a landlord may institute eviction proceedings. *See, e.g., Cooley v. Suitland Parkway Overlook Tenants Ass'n,* 460 A.2d 574, 576 (D.C.1983) ("[A]

tenant is entitled to receive [a notice to cure or vacate] before a suit to recover possession may be brought by his or her landlord for a violation of the tenancy.").

The Landlord first argues that, as a matter of statutory interpretation, this section was not intended to afford a tenant an opportunity to "correct" a breach of the lease consisting of criminal activity. The Landlord cites in this regard the reasoning of a Superior Court judge in an unrelated case where eviction had been sought based on the tenant's armed assault on another tenant on the premises. The judge stated there that § 42–3505.01(b)

> does not necessarily require landlords to provide a notice to cure when there is evidence that a tenant committed a discrete criminal act in violation of the lease .... This section seems logically to apply to a tenant who is committing an ongoing violation of the lease by, *e.g.,* keeping a pet, smoking, or failing to keep a unit sanitary. In such an instance, the tenant "is violating" the lease, and the landlord could send a notice to cure or vacate, providing the tenant with a 30–day period "to correct the violation." In contrast, on its face, this section seems less likely to apply to a tenant who violates a lease by committing a discrete criminal act. A tenant committing such an act is not "violating" the lease, but has already violated it.

---

"maintaining a gun on the property" was sufficient to direct her to the District's laws prohibiting possession of unregistered firearms and ammunition. *See generally Cook v. Edgewood Mgmt. Corp.,* 825 A.2d 939 (D.C. 2003); *District of Columbia v. Willis,* 612 A.2d 1275 (D.C.1992).

Appellant further contends that the Landlord failed to serve the notice to quit properly because the process server did not affix the correct first-class postage to the mailed notice. The trial judge found as a fact that first-

class postage had indeed been used, as required, *see* 24 C.F.R. § 247.4(b) (2002), and we have no reason to disturb that finding. *See* D.C.Code § 17–305(a) (2001). Although the process server could not recall the exact amount of postage he used, he testified that "whenever I do mailings like that, I go directly to a postal clerk and go through them and they help me put postage on and weight them out." That evidence was sufficient to support the judge's finding.

*District of Columbia Hous. Auth. v. Cherry*, No. 03–LT–15931 (D.C.Super.Ct. January 20, 2004)(Boasberg, J.). The judge pointed to the "absurd results" a contrary reading would entail:

> [W]hat would a tenant be required to do to cure? Simply commit no further crimes of the same sort? No further crimes of any sort? In this case, Defendants must press the strained claim that Ms. Cherry could cure by not assaulting other tenants for a month. Taken one step further, this reasoning means that a tenant who murdered another tenant could not be evicted as long as he refrained from killing anyone else—or perhaps from committing other crimes—for 30 days. This cannot be what the law is.

On the basis of that reasoning, the Landlord urges us to hold, as a matter of District law, that § 42–3505.01(b) does not apply to evictions sought for alleged criminal activity, whether "discrete" criminal acts or ongoing criminal activity.

The argument has considerable force. Although the grounds for eviction here were not an armed assault but possession of a loaded shotgun (though one that had been used to kill someone the day before), it would be little comfort to fellow residents that a tenant who has endangered their safety by permitting criminal activity on the premises promises to refrain from doing so again. And, as a textual matter, it seems implausible that the D.C. Council meant for either discrete (*i.e.*, completed) or continuing criminal activity to be "cor-

rect[ible]" upon such assurances before eviction may be sought. Section 42–3505.01(b), in the Landlord's view, is most naturally read to apply to traditional lease violations of the nuisance variety (such as Judge Boasberg illustrated) that can be abated or "cured" but that do not rise to the seriousness of criminal activity threatening the safety of other tenants. Other Superior Court judges have read the statute the same way.[3]

Nevertheless, reading the statute as a whole makes this conclusion at least open to debate. The main reason is that when the Council elsewhere meant to dispense with the opportunity to cure as a condition of lease termination—and with criminal behavior in mind—it did so unambiguously. The very next subsection of § 42–3505.01 allows a landlord to evict, merely by "serv[ice]" on the tenant [of] a 30–day notice to vacate," where "a court of competent jurisdiction has determined that the tenant, or a person occupying the premises with or in addition to the tenant, has performed an illegal act within the rental unit." Section 42–3505.01(c).[4] Here the absence of a cure opportunity for (adjudicated) unlawful acts is explicit. In the same way, D.C.Code § 42–3602 permits a landlord to evict, "*[n]otwithstanding* any provision of ... § 42–3505.01" (emphasis added), where a court has found a rental unit to be a statutorily-defined "drug haven." These provisions, insofar as they permit eviction without an opportunity to

---

**3.** *See, e.g., District of Columbia Hous. Auth. v. Williams*, No. 97–LT–15295 (D.C.Super.Ct. September 5, 1997) (Weisberg, J.); *District of Columbia Hous. Auth. v. Pratt*, No. 99–LT–39735 (D.C.Super.Ct. December 1, 2000) (Bartnoff, J.).

**4.** Even then, eviction may be ordered "only if the tenant knew or should have known that an illegal act was taking place." *Id.* The Landlord did not pursue eviction of Scarbor-
ough under § 42–3505.01(c), presumably because there had been no prior court determination that illicit activity took place within the apartment. At trial, no finding was made whether Scarborough knew or should have known of the unlawful presence of the loaded shotgun, although the judge was highly skeptical that she could claim lack of knowledge *after* Barr used it to shoot someone and then stowed it in the furnace room.

correct, would arguably be unnecessary if the general cure provision of § 42–3505.01(b) does not extend to lease violations criminal in nature.

It is unnecessary for us to pursue that question further, however. Scarborough occupied her rental unit under HUD's Mod Rehab rent-assistance program. Her lease provision permitting eviction for criminal activity on the premises was required to be included in the lease by federal law. The Landlord argues that, even if D.C. law otherwise afforded her an opportunity to correct the unlawful possession of a loaded shotgun, enforcing that requirement would frustrate the objectives of the federal program, and so must yield under principles of federal pre-emption—thus permitting her eviction on proper notice and the finding of the lease violation by the court. We agree with that position.

### III.

Strictly speaking, the issue is not one of federal pre-emption of state action, but whether, "[i]n matters of the present sort, a congressional statute [and regulations] of national application prevail[ ] over a statute applying only to the District of Columbia." *In re Estate of Couse,* 850 A.2d 304, 305 n. 1 (D.C.2004), quoting *District of Columbia v. Wolverton,* 112 U.S.App. D.C. 23, 24 n. 3, 298 F.2d 684, 685 n. 3 (1961). But, as no difference of substance has been suggested between that question and the issue of federal pre-emption, we apply the latter doctrine.

Courts have identified three ways in which a federal statute can pre-empt state law: by express pre-emption, where statutory language "reveals an explicit congressional intent to pre-empt state law," *Barnett Bank of Marion County v. Nelson,* 517 U.S. 25, 31, 116 S.Ct. 1103, 134 L.Ed.2d 237 (1996); by field pre-emption, in which "federal law

so thoroughly occupies a legislative field 'as to make reasonable the inference that Congress left no room for the States to supplement it,' " *Cipollone [v. Liggett Group, Inc.]*, 505 U.S. [504,] 516, 112 S.Ct. 2608, 120 L.Ed.2d 407 [ (1992) ] (citation and quotation marks omitted); and by implied or conflict pre-emption, which applies " 'where compliance with both federal and state regulations is a physical impossibility, . . . or where state law stands as an obstacle to the accomplishment and execution of the full purposes and objecti[ves] of Congress.' " *Boggs v. Boggs,* 520 U.S. 833, 844, 117 S.Ct. 1754, 138 L.Ed.2d 45 (1997) (citations omitted).

*In re Estate of Couse,* 850 A.2d at 308. The parties agree that this case does not involve express or field pre-emption, nor is compliance with both D.C.Code § 42–3505.01(b) and federal law a "physical impossibility." The question, rather, is whether application of the District's cure opportunity for criminal violations that threaten the safety or peace of other tenants would "stand as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." It is clear to us that it would.

Among the many conditions imposed by the Mod Rehab program (and by HUD's other housing assistance programs) are that specific provisions must appear in the written lease agreements with individual tenants. As relevant here, 42 U.S.C. § 1437f (d)(1)(B) states:

Contracts to make assistance payments entered into by a public housing agency with an owner of existing housing units shall provide (with respect to any unit) that—

\*     \*     \*     \*     \*     \*

(iii) during the term of the lease, *any criminal activity that threatens the*

*health, safety, or right to peaceful enjoyment of the premises by other tenants* ... engaged in by a tenant of any unit ... or any guest or other person under the tenant's control, *"shall be cause for termination of tenancy."* [Emphasis added.]

In enacting this provision, as in enacting a parallel provision for public housing, *see* 42 U.S.C. § 1437d (*l*)(6), Congress declared that "the Federal Government has a duty to provide public and other federally assisted low-income housing that is decent, *safe*, and free from illegal drugs." 42 U.S.C. § 11901(1) (emphasis added).

Although Congress enacted this "anticrime" provision in 1990, HUD took some time—until 2001—to issue specific implementing regulations that apply to the Mod Rehab program; those regulations apply to many other HUD programs as well and appear at 24 C.F.R. Part 5, Subpart I. *See* Screening and Eviction for Drug Abuse and Other Criminal Activity, 66 Fed.Reg. 28776 (May 24, 2001) (final rule); One–Strike Screening and Eviction for Drug Abuse and Other Criminal Activity, 64 Fed.Reg. 40262 (July 23, 1999) (proposed rule). Thus, 24 C.F.R. § 5.859(a)(1) implements 42 U.S.C. § 1437f (d)(1)(b)(iii) by stating that the lease under a subsidized housing program *"must* provide that the owner may terminate a tenancy for ... [a]ny criminal activity that threatens the health, safety, or right to peaceful enjoyment of the premises by other residents" (emphasis in original).[5] And 24 C.F.R. § 882, specifically governing Mod Rehab projects, authorizes a property owner to terminate a lease for "[v]iolation[s] of applicable Federal, State or local law," § 882.511(c)(2), while requiring public housing agencies to establish standards for termination of assistance for a family "any household member [of which] is engaged in criminal activity that threatens the health, safety, or right of peaceful enjoyment of the premises by other residents." Section 882.518(c)(2)(i).

In *Department of Hous. & Urban Dev. v. Rucker,* 535 U.S. 125, 122 S.Ct. 1230, 152 L.Ed.2d 258 (2002), the Supreme Court interpreted the authority conferred by the anticrime provision—all but identical to 42 U.S.C. § 1437f (d)(1)(B)(iii), applicable here—that governs leases administered by HUD-assisted public housing agencies. The issue there was whether the required lease provisions allow a housing authority to evict a tenant for criminal activity (there drug possession) regardless of whether the tenant knew or had reason to know of the activity or for any reason was unable to control it. The Court rejected the argument that such knowledge or control is necessary to permit eviction. It focused on the statutory language providing that "any" criminal activity posing the threatened danger to the health, safety, or right to peaceful enjoyment of other tenants is cause for lease termination, observing that "the word 'any' has an expansive meaning, that is, 'one or some indiscriminately of whatever kind.'" *Id.* at 131, 122 S.Ct. 1230.[6] In explaining why Congress had authorized public housing agencies to conduct no-fault evictions in these circumstances, the Court stated: "Regard-

---

**5.** In general, federal regulations have the same pre-emptive effect as federal statutes. *See, e.g., Hillsborough County, Florida v. Automated Med. Labs., Inc.,* 471 U.S. 707, 105 S.Ct. 2371, 85 L.Ed.2d 714 (1985); *Goudreau v. Standard Fed. Sav. & Loan Ass'n,* 511 A.2d 386, 389 (D.C.1986).

**6.** Moreover, the Court agreed with HUD that "by 'control' [as in 'other person under the tenant's control'], the statute means [only] control in the sense that the tenant has permitted access to the premises." *Rucker,* 535 U.S. at 131, 122 S.Ct. 1230 (citation and additional quotation marks omitted).

less of knowledge, a tenant who 'cannot control drug crime, or other criminal activities by a household member which threaten health or safety of other residents, is a threat to other residents and the project.' " *Id.* at 134, 122 S.Ct. 1230 (quoting 56 Fed. Reg. 51560, 51567 (October 11, 1991) (final rule)). The Court thus affirmed, in stark terms, the federal government's authority "as a landlord of property that it owns," *id.* at 135, 122 S.Ct. 1230, to prevent crime in federally-assisted housing by permitting the eviction of tenants when they or persons they have allowed access to their premises commit crimes threatening the health or safety of other residents.

Applying the cure provision of D.C.Code § 42–3505.01(b) would stand as a pronounced obstacle to the exercise of this authority. Not for nothing are lease provisions of the kind involved here described as manifesting a federal "One–Strike Policy."[7] The only way to make sense of the idea of "correct[ing]" criminal activity would be to require the tenant not to engage in such activity again. But, as HUD points out in the government's brief *amicus curiae*,[8] "this interpretation quickly renders the eviction provision a virtual nullity, because the grounds for eviction—the criminal act—would be washed away by a simple promise not to commit another crime." The very ease of thwarting the landlord's right to evict for commission of such a crime would frustrate the purpose of an anticrime provision that permits eviction for "any" criminal activity threatening in the sense defined.

It is true, as the *Rucker* Court pointed out, that termination of a tenancy after criminal activity is not automatic under federal law; housing providers have discretion whether to exercise the right of eviction. *See Rucker*, 535 U.S. at 133–34, 122 S.Ct. 1230. But the cure opportunity provided by § 42–3505.01(b), if applicable to violations of "an obligation of tenancy" dangerously criminal in nature,[9] would substitute for the landlord's discretion a mandatory second-strike opportunity for a tenant to stay eviction by discontinuing, or not repeating, the criminal act during the thirty days following notice. We do not believe Congress meant to permit that obligatory re-setting of the notice clock. Nor do we agree with appellant that this case demonstrates the feasibility of a cure period for at least some (otherwise dangerous) criminal violations. She asserts that she was "completely unaware of [the shotgun's] presence in her apartment," but see note 4, *supra*, and argues further that after the shooting death of Simmons she neutralized the risk of repeated criminal acts by "excluding Mr. Barr"—the shooter—"from the household" (Br. for Appellant at 27, 30). In part, however, this is the very claim of lack of knowledge and control of the criminal activity that *Rucker* rejected; a loaded shotgun, a semi-automatic pistol, and ammunition, all kept on the premises in violation of the criminal laws, "[are] a threat to other residents and the project" regardless of the tenant's knowledge and direct responsibility for their presence. *Rucker*, 535 U.S. at 134, 122 S.Ct. 1230. And an assurance by the

---

7.  *See* 64 Fed.Reg. 40262, *supra; see also* HUD Directive No. 96–16, Notice PIH 96–16(HA) (April 12, 1996) (announcing the "One Strike and You're Out" Policy).

8.  Following oral argument, we asked HUD to provide its views concerning two of the issues presented by this appeal.

9.  There can be no question that the presence of a loaded twelve-gauge semi-automatic shotgun in the apartment, together with a handgun and other ammunition, threatened the safety and peaceable enjoyment of other residents. The shooting death of Delante Simmons the day before, with the same shotgun, merely underscored that danger.

tenant that the chief wrongdoer has been barred from the premises is the sort of promise not to repeat that, because it is as easily broken as made, would undermine the federal objective if deemed sufficient to require a second opportunity to avoid eviction.

*Amici curiae* the Legal Aid Society and two non-profit organizations argue that, even where the basis for lease termination is criminal activity, HUD's regulations contemplate that tenants may invoke state or local protections such as § 42–3505.01(b) to stay an eviction. In particular, they point to 24 C.F.R. § 247.6(c), which provides:

A tenant may rely on State and local law governing eviction procedures where such law provides the tenant procedural rights which are in addition to those provided by this subpart, except where such State or local law has been preempted under part 246 of this chapter or by other action of the United States.

But even putting aside the exception here for local law "preempted . . . by . . . action of the United States," we do not agree that HUD intended a mandatory cure opportunity to somehow complement a landlord's statutory right to evict for criminal behavior that threatens the safety of other residents. When it adopted the regulation in question, HUD made clear the meaning of "local law governing eviction *procedures*" (emphasis added):

This interim rule clarifies the Department's intent that evictions of tenants from certain subsidized and HUD-owned projects be effected solely by judicial action. This rule requires the landlord to advise the tenant, in a termination notice, that the tenant is entitled to a court proceeding pursuant to state or local law at which he or she may present a defense to the eviction. The landlord is prohibited from resorting to "self-help" evictions or any non-judicial process, even where these actions are authorized by State or local law. *This rule is procedural only, and does not alter in any way the grounds for which the landlord may terminate a tenancy.*

48 Fed.Reg. 22913 (1983) (discussing 24 C.F.R. Part 450, redesignated as Part 247 in 49 Fed.Reg. 6712, 6713 (1984) (emphasis added)). Thus, while prohibiting self-help and instead requiring owners to seek enforcement of substantive rights in state judicial proceedings, § 247.6(c) does not limit the grounds on which eviction may be sought in those proceedings, nor the owner's right to an order of eviction for criminal acts. A "procedural" right to a second chance to refrain from criminal activity endangering other tenants would conflict fundamentally with 42 U.S.C. § 1437f (d)(1)(B)(iii).

## IV.

■ Appellant further argues that because, as the *Rucker* Court emphasized, housing providers under the federal program have discretion whether or not to pursue eviction for criminal activity, courts must review any such exercise of that discretion for an abuse—that is, for whether it was arbitrary and capricious. In this case, it is asserted, seeking to evict Ms. Scarborough and her children for a first-time possessory offense when she had no prior knowledge of the shotgun's presence and subsequently barred the wrongdoer from the premises was an abuse of the Landlord's federally-regulated authority. We reject the premise of this argument—that even when criminal activity has been found to provide a sufficient basis for eviction, a court may nonetheless review the landlord's exercise of discretion to seek lease termination.

■ A regulation issued by HUD informs housing providers that they "may" consider all of the circumstances relevant to a particular eviction, and supplies a non-exclusive list of factors they may consider. *See* 24 C.F.R. § 5.852. Thus, as the Court said in *Rucker*, the federal regime "does not *require* the eviction of any tenant," but rather "entrusts that decision [in the public housing context addressed there] to the local public housing authorities, who are in the best position to take account of, among other things, ... 'the seriousness of the offending action' ... and 'the extent to which the leaseholder has ... taken all reasonable steps to prevent or mitigate the offending action.'" *Rucker*, 535 U.S. at 133–34, 122 S.Ct. 1230 (citations omitted). But nothing in the regulation *requires* the Landlord to consider any particular factors before instituting eviction proceedings, a point HUD interpretations of the regulation have repeatedly made. Thus, in comments to a 2001 Final Rule, HUD explained that "a court's function under HUD's regulations is to determine whether an eviction meets the requirements of the lease and of [the applicable criminal activity prohibition], and not whether a [housing provider] has considered additional social and situational factors that HUD's regulations authorize, but do not require." 66 Fed.Reg. at 28782. And a 2002 letter by Carole W. Wilson, HUD's Associate General Counsel, likewise explained that HUD's regulations had sought to make clear that, while the federal statute does not compel the eviction of any tenant, nothing in the statute or regulations requires a housing provider to "consider, prior to initiating an eviction action, anything other than whether the relevant lease provision has, in fact, been violated." Letter to Charles J. Macellaro (Aug. 15,

2002). The additional letters cited by appellant's *amici* confirm that, while housing providers are encouraged to balance a wide range of factors, the decision is ultimately theirs, "as they deem appropriate," whether to seek eviction "as a consequence of [a proven] lease violation." Letter from Michael M. Lui, Assistant Secretary of HUD (June 6, 2002).

In sum, the federal statute, 42 U.S.C. § 1437f (d)(1)(B)(iii), authorizes eviction based on specified criminal activity, without limitation by, or balancing or consideration of, any other factors. HUD's regulations and interpretive statements confirm that such lease violations are sufficient substantive grounds for eviction *and* that the role of reviewing courts (besides insuring proper notice and opportunity to defend) is to determine whether the ground relied upon for eviction exists. *Rucker* itself does not require a Landlord to weigh additional considerations opposing and favoring eviction before pursuing lease termination. *See, e.g., Minneapolis Pub. Hous. Auth. v. Lor*, 591 N.W.2d 700, 703–04 (Minn.1999); *contra Oakwood Plaza Apartments v. Smith*, 352 N.J.Super. 467, 800 A.2d 265, 267–68 (2002). Thus, the Landlord's decision to evict appellant upon proof and a finding by the trial court that she permitted criminal activity in her apartment threatening the safety and right of peaceful enjoyment of other residents was in accordance with the law.[10]

*Affirmed.*

■

---

10. By order of this court, the judgment of possession has been stayed pending resolution of Ms. Scarborough's appeal. The Landlord, of course, is free to consider intervening cir-

cumstances in deciding on whether to enforce the judgment.