# HOUSING AUTHORITY OF THE CITY OF NORWALK *v.* GLORIA BROWN ET AL.
## (AC 31214)

Bishop, Beach and Borden, Js.

Argued February 14—officially released June 7, 2011

*Abram Heisler*, for the appellant (named defendant).

*Donna M. Lattarulo*, for the appellee (plaintiff).

*Opinion*

BEACH, J. In this summary process action, the defendant, Gloria Brown,[1] appeals from the judgment of the trial court awarding possession of certain premises to the plaintiff, the housing authority of the city of Norwalk. On appeal, the defendant claims that the court erred by (1) concluding that she was in violation of the terms of her lease agreement and (2) failing to sustain her special defense. We affirm the judgment of the trial court.

The following facts and procedural history, as set forth by the court in its memorandum of decision, are relevant to our resolution of the defendant's appeal. The plaintiff is the owner of federally subsidized housing premises located on 261 Ely Avenue in Norwalk (premises). On April 1, 2008, the defendant entered into a

---

[1] Both Gloria Brown and her son, George Kalu, were defendants at trial. Because only Gloria Brown participated in this appeal, we refer to her in this opinion as the defendant.

lease agreement with the plaintiff for the use and occupancy of an apartment on the premises.[2] The lease commenced on the same date, for a one month period, and was renewed automatically in successive terms of one month following the expiration of the initial term. Pursuant to the lease, George Kalu was an authorized occupant of the apartment.

On or about July 26, 2008, Kalu was arrested for drug related activity[3] that had occurred at the Washington Village housing authority complex in Norwalk, which also is owned by the plaintiff. Kalu was convicted of illegal possession of narcotics, interfering with an officer and violation of probation.[4] Kalu was sentenced to a total effective term of four years incarceration followed by six years of special parole.

As a result of Kalu's conviction, the plaintiff issued to the defendant a pretermination notice on August 5, 2008, informing her that her lease was to be terminated in thirty days because of Kalu's drug related criminal conduct. On September 17, 2008, the plaintiff served on the defendant a notice to quit possession and to vacate the premises on or before September 24, 2008. The defendant failed to vacate the premises by the date specified in the notice to quit possession, and, as a result, the plaintiff initiated the current summary process action. The plaintiff's complaint alleged that the defendant was in violation of her lease agreement because of Kalu's drug related criminal activity.[5] The

[2] The lease pertained specifically to Roodner Court, building 16, apartment 3F.

[3] Kalu allegedly was in possession of seventeen bags of cocaine.

[4] The conviction for violation of probation stemmed from robbery and narcotics charges that had occurred in 2006. At the time of his arrest in 2006, Kalu was a minor and was residing with the defendant at the same premises at issue in this case.

[5] The plaintiff's complaint also alleged three other counts. During the trial, however, the plaintiff informed the court that it was proceeding only on the breach of lease claim.

defendant filed an answer and set forth various special defenses.

In its memorandum of decision, the court found that "the defendant . . . had knowledge of [Kalu's] 2006 drug arrest. . . . She made no effort to have Kalu removed from the premises after the 2006 arrest[6] and never informed [the plaintiff] of his 2008 arrest and incarceration. Since the 2006 arrest, [the] defendant . . . knew of [Kalu's] involvement with drugs and that he would continue such activities on the plaintiff's premises." The court concluded that the defendant had breached her lease and, thus, rendered a judgment of possession in favor of the plaintiff. This appeal followed.

I

The defendant first claims that the court erred in concluding that she was in breach of her lease agreement. We disagree.

We begin by setting forth our standard of review and relevant legal principles. "Appellate review of a trial court's findings of fact is governed by the clearly erroneous standard of review. The trial court's findings are binding upon this court unless they are clearly erroneous in light of the evidence and the pleadings in the record as a whole. . . . We cannot retry the facts or pass on the credibility of the witnesses. . . . A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. . . . The court, as the sole arbiter of credibility, is free to accept or reject, in whole or in part, the testimony offered by either party." (Internal quotation marks omitted.)

[6] See footnote 4 of this opinion.

*Shelton* v. *Olowosoyo*, 125 Conn. App. 286, 291, 10 A.3d 45 (2010).

"Summary process is a special statutory procedure designed to provide an expeditious remedy. . . . It enable[s] landlords to obtain possession of leased premises without suffering the delay, loss and expense to which, under the common-law actions, they might be subjected by tenants wrongfully holding over their terms." (Internal quotation marks omitted.) *Housing Authority* v. *DeRoche*, 112 Conn. App. 355, 361, 962 A.2d 904 (2009). "Our Supreme Court has stated that [a]s a condition precedent to a summary process action, proper notice to quit is a jurisdictional necessity. . . . Simply put, before a landlord may pursue its statutory remedy of summary process, the landlord must prove compliance with all of the applicable preconditions set by state and federal law for the termination of the lease." (Citations omitted; internal quotation marks omitted.) Id.

In the present case, the record clearly establishes that the plaintiff served the defendant with a notice to quit possession on September 17, 2008, more than thirty days after she properly was served with a pretermination notice. Having established that the notice to quit possession was properly served on the defendant, we note that she does not challenge the plaintiff's compliance with any of the applicable preconditions set by state and federal law required to terminate her lease. Rather, the defendant argues that the court erred in concluding that she violated her lease because it erroneously found that Kalu's 2008 drug related activity for which he was arrested occurred on the premises. We disagree.

The court did not conclude that Kalu's 2008 drug related activity had occurred on the premises. The court merely stated that "both arrests involving Kalu occurred

on housing authority property." It is uncontested that Kalu's drug related arrest in 2008 occurred at the Washington Village housing authority complex, which is owned by the plaintiff. Thus, contrary to the defendant's contention, the court never held that Kalu's drug related activity occurred on the leased premises; rather, it only concluded that it occurred on property *owned by* the plaintiff. Moreover, the location at which Kalu's drug related activity occurred is irrelevant in the circumstances of this case. The defendant's lease specifically states: "Management shall not terminate or refuse to renew the Lease for other than failure to pay rent . . . or for other good cause. 'Good cause' includes but is not limited to . . . illegal drug-use or drug-related criminal activity on *or off* the premises . . . ." (Emphasis added.) The unambiguous language of the lease provides for termination of the lease for drug related activity even if it does not occur on the premises. Accordingly, because the record clearly establishes that Kalu engaged in drug related criminal activity, we conclude that the court did not err in determining that the defendant breached her lease agreement.

## II

The defendant also claims that the court erred by failing to sustain her fifth special defense. We are not persuaded.

The defendant argues that the court erred in concluding that Kalu's incarceration did not constitute a cure of her breach of lease pursuant to General Statutes § 47a-15 because "[a]ny violation of [her] lease is highly unlikely to recur due to the incarceration of [Kalu]." The plaintiff, on the other hand, argues that when the ground for a breach of lease is drug related criminal activity, such a breach is incapable of being cured pursuant to § 47a-15. Therefore, the issue to resolve on appeal is whether § 47a-15 contemplates the ability of

a tenant to cure a breach of lease and, thus, avoid eviction when the conduct constituting the breach is drug related criminal activity. We conclude that § 47a-15 does not permit the defense in such circumstances.

"Well settled principles of statutory interpretation govern our review. . . . Because statutory interpretation is a question of law, our review is de novo. . . . When construing a statute, [o]ur fundamental objective is to ascertain and give effect to the apparent intent of the legislature. . . . In other words, we seek to determine, in a reasoned manner, the meaning of the statutory language as applied to the facts of [the] case, including the question of whether the language actually does apply. . . . [We] first . . . consider the text of the statute itself and its relationship to other statutes. If, after examining such text and considering such relationship, the meaning of such text is plain and unambiguous and does not yield absurd or unworkable results, extratextual evidence of the meaning of the statute shall not be considered. . . . The test to determine ambiguity is whether the statute, when read in context, is susceptible to more than one reasonable interpretation. . . . When a statute is not plain and unambiguous, we also look for interpretive guidance to the legislative history and circumstances surrounding its enactment, to the legislative policy it was designed to implement, and to its relationship to existing legislation and common law principles governing the same general subject matter . . . ." (Internal quotation marks omitted.) *McCoy* v. *Commissioner of Public Safety*, 300 Conn. 144, 150–51, 12 A.3d 948 (2011).

We begin our analysis by examining the text of § 47a-15. Section 47a-15 provides in relevant part: "Prior to the commencement of a summary process action . . . if there is a material noncompliance by the tenant with the rental agreement . . . and the landlord chooses to evict based on such noncompliance, the landlord shall

deliver a written notice to the tenant specifying the acts or omissions constituting the breach and that the rental agreement shall terminate upon a date not less than fifteen days after receipt of the notice. *If such breach can be remedied by repair by the tenant or payment of damages by the tenant to the landlord, and such breach is not so remedied within such fifteen-day period,* the rental agreement shall terminate . . . ." (Emphasis added.)

The obvious meaning of "repair" would seem to refer to physical items that are capable of being fixed. The hazard of the drug culture would not appear to be susceptible to "repair." Although "repair by the tenant" does not, at first glance, then seem to refer to the amelioration of criminal activity, it is possible to construe the word "repair" expansively to include "restoration to a state of . . . health . . . ." Webster's Third New International Dictionary (1996) p. 1923. Because the term "repair by the tenant" is susceptible to more than one reasonable interpretation, we conclude that the cure provision of § 47a-15 is ambiguous as applied to the facts of this case.[7]

We now turn to the legislative history of § 47a-15. Section 47a-15 provides that a landlord can evict a tenant "based on . . . conduct by the tenant which constitutes a serious nuisance." In 1997, § 47a-15 was amended to include a provision expanding the definition of serious nuisance to include the following: "in the case of a housing authority, using any area within fifteen hundred feet of any housing authority property in which the tenant resides for the illegal sale of drugs."[8]

[7] Our conclusion is limited to the particular facts of this case. We make no determinations as to whether the term would be ambiguous as applied to other circumstances.

[8] We note that in the present case, the defendant was evicted because she breached the terms of her lease, not because a serious nuisance had occurred. Nevertheless, the legislative history regarding serious nuisance is relevant because it addresses whether a tenant can "repair" drug related criminal activity, which is the very activity that constituted the defendant's

Public Acts 1997, No. 97-231, § 2. The discussion in the House of Representatives addressed the issue of the effect that this amendment would have on so-called "innocent or unknowing" tenants. For example, Representative Evelyn C. Mantilla inquired as to "the effect [of this amendment] on the family who may be living [in] a unit of public housing . . . should a member of that family, be it a son or a daughter, be the one who is found to have been selling or dealing drugs . . . ." H.R. Proc., Pt. 12, 1997 Sess., p. 4307. Representative Paul R. Doyle responded that "it does in fact mean that if a family member does sell drugs within 1500 feet of the premises, the entire apartment could be vacated. All of the family could be removed there. It's a way that the housing authorities want to try to . . . you know, 'clean up' the housing authorities. And they're trying to rid the housing authorities of drugs." Id., pp. 4307–4308. Representative Doyle further stated that "[i]t may sound unfair to certain people, but this is what the housing authorities encourage because you have to remember, there are people living in apartments right next to this apartment where drugs are being sold. And this amendment and the expansion of [it is] really directed toward other people living in housing authorities because drug dealing is a problem in certain housing authorities. So . . . it may feel harsh to you, to that mother, but then you look at the neighbors who are trying to live there in peace and quiet when there's drug dealing and other problems there. It's a way to try to clean it out." Id., pp. 4310–11. On the basis of this legislative history, and the absence of any contrary suggestion, we conclude that the legislature did not intend to create

---

breach of lease. Accordingly, the legislative history regarding serious nuisance directly addresses the issue of whether § 47a-15 contemplates the ability of a tenant to cure a breach of lease when the conduct constituting the breach is drug related criminal activity.

an ability to "repair" drug related criminal activity pursuant to § 47a-15.[9]

Our conclusion is bolstered by consideration of the United States Supreme Court's decision in *Dept. of Housing & Urban Development* v. *Rucker*, 535 U.S. 125, 122 S. Ct. 1230, 152 L. Ed. 2d 258 (2002). In that case, the Supreme Court held that "42 U.S.C. § 1437d (*l*) (6)[10] unambiguously requires lease terms that vest local public housing authorities with the discretion to evict tenants for the drug-related activity of household members and guests whether or not the tenant knew, or should have known, about the activity." Id., 130. The court reasoned that 42 U.S.C. § 1437d (*l*) (6) permits "local public housing authorities to conduct no-fault evictions . . . [because] [r]egardless of knowledge, a tenant who cannot control drug crime, or other criminal activities by a household member which threaten health or safety of other residents, is a threat to other residents and the project. . . . With drugs leading to murders, muggings, and other forms of violence against tenants, and to the deterioration of the physical environment that requires substantial government expenditures . . . it was reasonable for Congress to permit no-fault evictions in order to provide public and other federally assisted low-income housing that is decent, safe, and free from illegal drugs . . . ." [11] (Citations omitted; internal quotation marks omitted.) Id., 134.

---

[9] It should be noted that § 47a-15 specifically excludes from the "repair" provision evictions based on serious nuisance, where the nuisance is the illegal sale of drugs on the premises.

[10] Title 42 of the United States Code, § 1437d (*l*), provides in relevant part: "Each public housing agency shall utilize leases which . . . (6) provide that *any* criminal activity that threatens the health, safety, or right to peaceful enjoyment of the premises by other tenants or *any* drug-related criminal activity on *or off* such premises, engaged in by a public housing tenant, any member of the tenant's household, or any guest or other person under the tenant's control, *shall* be cause for termination of tenancy . . . ." (Emphasis added.) Federal authority on this issue is, then, persuasive.

[11] We note that although the United States Supreme Court determined that 42 U.S.C. § 1437d (*l*) (6) permits local public housing authorities to

Additionally, we believe that the decision of the District of Columbia Court of Appeals in *Scarborough* v. *Winn Residential, LLP,* 890 A.2d 249 (D.C. 2006), is directly on point and thus further supports our conclusion. In *Scarborough,* the Court of Appeals considered the question of whether, as a matter of law, a breach of lease is curable pursuant to D.C. Code § 42-3505.01 (b) (2001)[12] when the conduct constituting the breach is "discrete criminal acts or ongoing criminal activity." (Internal quotation marks omitted.) Id., 254. The court held that, as a matter of law, such breaches cannot be cured because otherwise it would "stand as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." (Internal quotation marks omitted.) Id., 255. Congress declared that those purposes and objectives are "to provide public and other federally assisted low-income housing that is decent, *safe, and free from illegal drugs.*" (Emphasis added; internal quotation marks omitted.) Id., 256. The court acknowledged that, to effectuate these purposes, Congress intended "to prevent crime in federally-assisted housing by permitting the eviction of tenants when they or persons they have allowed access to their premises commit crimes threatening the health or safety of other residents." Id., 257. Congress, in effect,

conduct no-fault evictions, the court also stated that § 1437d (*l*) (6) "does not require the eviction of any tenant who violated the lease provision. Instead, it entrusts that decision to the local public housing authorities, who are in the best position to take account of, among other things, the degree to which the housing project suffers from rampant drug-related or violent crime . . . the seriousness of the offending action . . . and the extent to which the leaseholder has . . . taken all reasonable steps to prevent or mitigate the offending action . . . ." (Citations omitted; internal quotation marks omitted.) *Dept. of Housing & Urban Development* v. *Rucker,* supra, 535 U.S. 133–34.

[12] Section 42-3505.01 (b) of the District of Columbia Code provides: "A housing provider may recover possession of a rental unit where the tenant is violating an obligation of tenancy and fails to correct the violation within 30 days after receiving from the housing provider a notice to correct the violation or vacate."

intended to establish a " 'One-Strike Policy' " regarding criminal activity involving residents of federally subsidized housing. Id., 257 n.7. As such, the court stated that allowing a tenant to "correct" a breach stemming from criminal activity and, thus, to avoid eviction, would be inconsistent with the essence and strict mandate of 42 U.S.C. § 1437d (*l*) (6). Id., 257. The court reasoned that "[t]he only way to make sense of the idea of correct[ing] criminal activity would be to require the tenant not to engage in such activity again. . . . [T]his interpretation, [however] quickly renders the eviction provision a virtual nullity, because the grounds for eviction—the criminal act—would be washed away by a simple promise not to commit another crime. The very ease of thwarting the landlord's right to evict for commission of such a crime would frustrate the purpose of an anticrime provision that permits eviction for *any* criminal activity . . . ." (Emphasis added; internal quotation marks omitted.) Id.

We also note that our conclusion is consistent with this court's decision in *Housing Authority* v. *Martin*, 95 Conn. App. 802, 898 A.2d 245, cert. denied, 280 Conn. 904, 907 A.2d 90 (2006). In that case, this court stated that not all breaches are capable of being cured pursuant to § 47a-15. Id., 813. In so stating, this court reasoned that "[t]he statutory language [of § 47a-15] clearly and unambiguously anticipates a situation in which a violation cannot be cured by the tenant. Otherwise, the statute simply would have stated that a lease will not terminate if the tenant remedies the designated breach within the fifteen day cure period." Id. Accordingly, we conclude that the defendant cannot "cure" her breach of lease and, thus, avoid eviction when the conduct constituting the breach is drug related criminal activity.

The judgment is affirmed.

In this opinion the other judges concurred.