*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 18-CV-380

MARIA WILLIAMSON, APPELLANT,

V.

ST. MARTIN'S APARTMENTS, L.P., APPELLEE.

Appeal from the Superior Court
of the District of Columbia
(LTB-24829-17)

(Hon. Robert R. Rigsby, Trial Judge)
(Hon. Katherine Wiedmann, Motion Judge)

(Argued September 12, 2019                    Decided August 6, 2020)

*Daniel Gonen*, Public Defender Service, with whom *Samia Fam*, Public Defender Service, was on the brief, for appellant.

*Andrew M. Palanzi* for appellee.

Before FISHER and THOMPSON, *Associate Judges*, and RUIZ, *Senior Judge*.

THOMPSON, *Associate Judge*:    Defendant/appellant Maria Williamson was

sued by her landlord, appellee St. Martin's Apartments, L.P. ("St. Martin's"), for

possession of her rental unit at The Summit apartment complex,[1] based on allegations of criminal activity by appellant in violation of her lease. This appeal is from a judgment of the Superior Court, entered after a bench trial, granting St. Martin's a non-redeemable judgment of possession. Appellant contends that the trial court abused its discretion in denying her post-return-date demand for a jury trial; erred in finding that the Notice to Quit served on appellant by St. Martin's was legally adequate; and further erred in finding the evidence adequate to prove that appellant threatened one of her neighbors with bodily harm and sold drugs within the apartment complex. We agree with appellant that the trial court erroneously exercised its discretion in refusing to honor appellant's jury demand.[2] Accordingly, we vacate the judgment and remand for further proceedings. We address the issue of the adequacy of the Notice to Quit in case it arises on remand, but we do not reach the evidentiary sufficiency issues since the evidence presented at any retrial may differ from that presented during the original trial.

---

[1] The Summit is a federally subsidized apartment complex (a low-income-housing "tax credit property") that receives funding from the Department of Housing and Urban Development ("HUD").

[2] We also agree with the parties that the evidence did not support the court's finding of a drug-haven violation at the time of trial. *See* D.C. Code § 42-3602 (2020 Repl.) and *Ball v. Arthur Winn Gen. P'ship*, 905 A.2d 147, 153 (D.C. 2006).

## I.

On July 31, 2017, St. Martin's served on appellant a "Thirty (30) Day Notice to Quit and Vacate Premises Due to the Commission of An Illegal Act." The Notice to Quit cited "threats made by Tenant" and "Tenant's possession of illegal substances with the intent to distribute." On October 20, 2017, St. Martin's filed its complaint for possession of appellant's rental unit, alleging that "tenant is engaging in criminal activity at the Premises, including possession and distribution of illegal substances and making criminal threats." Appellant appeared in court pro se on November 20, 2017, and the court and the parties agreed on a trial date of January 26, 2018. Appellant did not request or reserve the right to demand a jury trial.

A few days before appellant was due to appear in court again on January 26, 2018, the Public Defender Service ("PDS") agreed to represent her. Her counsel explained that appellant had been "trying to obtain counsel for a while through the legal services organizations," which contacted PDS about the case. Explaining that PDS had not had sufficient time to prepare for trial, counsel moved for a continuation of the trial date, sought leave to conduct discovery (eight

interrogatories), and made a demand for jury trial. The court (Magistrate Judge Katherine Wiedmann) agreed to continue the trial date to February 12, 2018 (and later, the trial was further continued to March 13, 2018, after St. Martin's sought a continuance because of the illness of two of its expected witnesses), and authorized the discovery. However, the court denied appellant's demand for a jury trial, explaining that there was nothing "in the record that any rights were reserved" and "weighing the balance and the nature of these proceedings." The court affirmed that ruling in denying appellant's motion for reconsideration, reasoning that the court was "without recourse" to grant the reconsideration motion and not finding "any uncontrollable circumstances which prevented" appellant from complying with the Landlord-Tenant Branch rule generally requiring that any jury demand be made by the appearance date specified in the summons.

Associate Judge Robert Rigsby presided over the bench trial. St. Martin's property manager Darren Bethea testified that he had received anonymous notes reporting drug activity from appellant's apartment. Pamela Bumbray, another resident at The Summit, testified about a threat made by appellant (a voicemail message left by appellant on Ms. Bumbray's telephone on July 3 or 6, 2017, in

which appellant threatened to "punch [Ms. Bumbray] in [her] face"[3]) and about appellant's sales of crack cocaine to Ms. Bumbray herself and to other residents of The Summit (including Michelle Orimba and Chrystal Little) between January 2017 to July 2017 (i.e., within six months before the Notice to Quit was served).[4] Resident Michelle Orimba testified that she saw appellant sell drugs to Ms. Bumbray in March of 2017.

In a bench ruling on April 4, 2018, Judge Rigsby found that the Notice to Quit provided sufficient detail to notify appellant of the lease violations, that appellant "regularly sold crack" to her neighbors, that appellant threatened Ms. Bumbray,[5] and that St. Martin's was entitled to recover possession of appellant's

---

[3] At one point, Ms. Bumbray testified that the incident occurred on July 3, 2017. At another point, she testified that the incident she described happened on or about July 6, 2017.

[4] *See* 14 DCMR § 4301.4 (2020) (providing that the term "[v]iolations of an obligation of tenancy," which may entitle a landlord to evict a tenant if the violations remain uncured after a thirty-day notice-to-correct has been served, refers only to obligations contained in a valid, written lease that "are alleged to have occurred no more than six (6) months prior to the issuance of the notice").

[5] The court also found that appellant was engaged in running a drug haven. St. Martin's had not pursued a drug-haven claim, and the parties agree that the evidence was insufficient to support eviction on that basis.

unit. The trial court denied appellant's motion for a stay, but this court granted a stay pending resolution of this appeal.

## II.

We begin our analysis with appellant's argument that the trial court abused its discretion by denying appellant's untimely demand for a jury trial.[6] Landlord & Tenant Rule 6(a) provides that:

> Any party entitled to a jury trial may demand a trial by jury of any action by filing a jury demand, signed by the party or his or her attorney of record. The demand must be filed not later than the date for appearance stated in the summons, or by a later date set by the court for good cause[.]

Super. Ct. L&T R. 6(a). It is well-settled that "[a] tenant is constitutionally entitled to a jury trial in defending a landlord's action for possession." *King v.*

---

[6] St. Martin's urges affirmance of the magistrate judge's ruling on the ground that appellant failed to seek review by an Associate Judge within the time period prescribed by Super. Ct. Civ. R. 73(b)(1)–(4). However, Rule 73(b) is inapposite because denial of a jury demand is a nonappealable interlocutory order. *See Morgantown v. Royal Ins. Co.*, 337 U.S. 254, 258 (1949); *see also Stebbins v. Stebbins*, 673 A.2d 184, 191 (D.C. 1996) ("[A] direct appeal from the resulting judgment and a new trial, if there were error in denying the jury, will suffice.").

*Berindoague*, 928 A.2d 693, 697 (D.C. 2007). It is also well-established, however, that the right to a jury trial may be waived. *See Dominique v. Ralph D. Kaiser Co.*, 479 A.2d 319, 322 (D.C. 1984) (per curiam). Moreover, "[t]he waiver need not be knowing and intelligent in order to be effective; the right may be waived by the mere failure to comply with reasonable rules, even if that failure is unintentional." *Id.* (internal quotation marks omitted).

Appellant's jury demand was untimely, as she failed to request a jury trial when she appeared in court pro se on November 20, 2017, the date stated in the summons. Nevertheless, the timely-jury-demand rule "is not absolute." *Id.* The factors to be considered as the trial court exercises its discretion regarding whether to grant an untimely jury demand include "the possibility of prejudice to other parties and the likelihood of delay" as well as factors "pertinent to the interests of both parties and also to the general conduct of the business of the court." *Id.*

In this case, these factors and others persuade us that the trial court erroneously exercised its discretion in denying appellant's demand for a jury trial. As recounted above, at the time appellant, through counsel, made her jury demand, she also requested a continuance of the trial date for her counsel, who had just agreed to represent her, to conduct discovery and otherwise to prepare her defense,

and the court readily granted a two-week continuance. Thus, the court approved a delay in the proceedings, and nothing in the record indicates that affording a jury trial would have occasioned significant additional delay. Further, although St. Martin's opposed a continuance, it did not identify to the trial court (and still has not identified) how it would have been prejudiced by whatever delay a jury trial would have occasioned.

In addition, as it turned out, trial could not be held for over four additional weeks because of the illness of witnesses for St. Martin's. To be sure, it was not known at the time the jury demand was refused that these additional delays would ensue, but the fact that they did ensue is part and parcel of what can happen as a trial date approaches — meaning that the prospect of a delay of several weeks is not a weighty reason to deny an untimely jury request if it is otherwise justified.[7]

The general conduct of the business of the court favors observance of the deadlines imposed by court rules. In addition, we have recognized "the general principle . . . that [an unrepresented] litigant can expect no special treatment from the court." *Padou v. District of Columbia*, 998 A.2d 286, 292 (D.C. 2010)

---

[7] In any event, "some delay must be tolerated if the right to a jury trial is to be honored." *King*, 928 A.2d at 698–99.

(internal quotation marks omitted and brackets included). Further, "the general conduct of the business of the court"[8] in the Landlord Tenant Branch is "designed to insure an expeditious resolution" of disputes. *Smith v. Greenway Apts. LP*, 150 A.3d 1265, 1275 (D.C. 2016).

We have explained, however, that "the regulatory goal is to safeguard the summary, expeditious nature of the action for possession due to nonpayment of rent, so that a landlord will not have a prolonged wait for any rent payments that are due[,]" but not to "cut[] off the right of a tenant to assert specified defenses[.]" *Id.* This case is not a non-payment of rent case, but instead is a lease-violation case in which counsel advised the court that the tenant would need to defend against allegations that she engaged in criminal activity. Thus, although action to evict drug dealers from HUD-assisted housing is an important goal, this was not a case in which our stated reasons for expediting landlord-tenant proceedings should have been a weighty factor in the court's determination as to whether there was good cause to grant the untimely jury-trial demand.[9] On the other hand, whether

---

[8] *Dominique*, 479 A.2d at 322.

[9] We note that in adopting its regulations that address the authority of HUD-assisted housing developments to evict tenants for criminal activity, *see* 24 C.F.R. § 5.861, HUD encouraged housing authorities to "employ administrative action to resolve potential eviction cases before resorting to court action," 66 Fed. Reg.

(continued…)

appellant engaged in illegal activities on the premises in violation of her lease would determine whether appellant would lose her housing. In view of such a grave potential consequence, preserving appellant's exercise of the constitutionally protected right to submit the case for decision by a jury of her peers who bring to bear their collective experience and knowledge to resolve conflicting testimony is a particularly weighty consideration that the trial court should have taken into account.

An additional important consideration pertaining to the general conduct of the business of the court was that Landlord-Tenant court is one of our court system's high-volume courts in which we unfortunately have made little progress toward ensuring the availability of pro bono representation for tenants like appellant who cannot afford lawyers. There is a need to be flexible in addressing the continuing problem of indigent civil litigants' inadequate access to legal representation. We have joined other courts in emphasizing the importance of having someone (whether the court, lawyers staffing the court resource centers, or others) "provid[e] pro se litigants with the necessary knowledge to participate effectively in the trial process." *Reade v. Saradji*, 994 A.2d 368, 373 (D.C. 2010)

---

(…continued)
28776 (May 24, 2001). The agency's comment implies that expediting the completion of court proceedings in such cases is not paramount.

(internal quotation marks omitted). And we require trial judges to "exercise special care with a *pro se* litigant in special circumstances[,]" *id.*, which, we have said, "will sometimes require the judge to inform a party of the consequences of her procedural acts or omissions." *Berkley v. D.C. Transit, Inc.*, 950 A.2d 749, 756–57 n.12 (D.C. 2008). Recognizing the critical role judges play in ensuring that rights are not inadvertently lost by unrepresented litigants, the Code of Judicial Conduct similarly advises that judges have an "affirmative role" in making "reasonable accommodations that help litigants who are not represented by counsel to understand the proceedings and procedural requirements." Rule 2.6 (Ensuring the Right to be Heard), Cmt. 1A. In this case, the court could have informed appellant of her right to request a jury trial and the deadline and manner for doing so, while refraining from advising on its advisability either way; another option was "making a referral to any resources available," *id.*, which includes the landlord-tenant resource center conveniently located at the court, and, if necessary, allowing a brief continuance to allow consultation.

Appellant's trial counsel emphasized that, on the return date, appellant was not counseled that she would be waiving her right to a jury trial if she failed to demand one on that day. Even if she had been so advised, it is questionable whether she would have chosen to go to a jury trial without the assurance that she

would have counsel to help her navigate trial procedure. In this continuing circumstance that unrepresented litigants face in our high-volume courts, a good faith claim that the tenant sought but was unable to obtain legal representation may fairly be regarded as an uncontrollable circumstance that can suffice as the good cause for extending the jury-demand deadline. Here, where counsel who was obtained after the return date represented that the tenant unsuccessfully sought counsel for the return date, made a jury demand on the tenant's behalf, and made a request for a continuance (in this case to allow for preparation and discovery) that the court approved, there was good cause to extend the deadline. That is not to say, of course, that the balance of factors will always favor the tenant; the landlord's showing of serious prejudice, for example, may warrant a different result.

In reasoning that she was "without recourse" to grant appellant's renewed demand for a jury trial, the magistrate judge applied an unduly constricted understanding of the breadth of her discretion. *See Daly v. Scala*, 39 A.2d 478, 479 (D.C. 1944) (explaining that "[r]ules or statutes limiting the time for filing a demand for a jury trial, although mandatory in terms, are not always so regarded"; "where the opposing party is not prejudiced, the court, in its discretion, may waive the delay"). A trial court erroneously exercises discretion when it does not realize

that it has discretion and "assumes [that there is] but one answer to the question presented." *See Johnson v. United States*, 398 A.2d 354, 363 (D.C. 1979). Moreover, the trial court apparently thought that only an "uncontrollable" circumstance would justify allowing an untimely request for jury trial. The inquiry actually requires a more nuanced consideration of various interests. *See Kass v. Baskin*, 164 F.2d 513, 515-17 (D.C. Cir. 1947) (construing substantially similar rule).[10] And in the case of an unrepresented litigant, because we recognize the obstacles faced by a lay person, the judicial task demands that the judge take reasonably appropriate steps to address them.

We cannot say that the court's erroneous exercise of discretion was harmless, as it is possible that a jury would have made a differing assessment of

---

[10] As the D.C. Circuit explained in *Kass*, the existence of uncontrollable circumstances might well suffice to preserve the right to a jury trial even if the demand is untimely made. But uncontrollable circumstances is not the governing standard; instead, in exercising discretion, the judge needs to take into account "any and all pertinent factors in the case, including particularly the nature of the issues presented by the pleadings and the general orderly disposition of the court's business." 164 F.2d at 515; *see also id.* at 517 ("We hold that when a party has failed to comply with the requirements of the Rule in respect to demands for jury trial, and thereafter appeals to the court to grant such trial, the matter lies within the sound discretion of the court. In exercising that discretion, the court may consider all elements pertinent to the interests of both parties and also to the general conduct of the business of the court. The sole exception, if any, to this general rule should be, as we have indicated, the case where uncontrollable circumstances prevent compliance with the terms of the Rule; there the right may perhaps be preserved.").

the credibility of St. Martin's eyewitnesses (each of whom was significantly impeached).[11]    Accordingly, we conclude that we must vacate the judgment in favor of St. Martin's and remand for a jury trial.  *LaPrade v. Liebler*, 614 A.2d 546, 548 (D.C. 1992) (reversing and remanding where party was deprived of right to trial by jury).

**III.**

We briefly address appellant's argument that St. Martin's complaint should not have proceeded to trial because the Notice to Quit did not adequately inform appellant of the alleged violations.    D.C. Code § 42-3505.01(a) (2020 Repl.) provides that "[a]ll notices to vacate shall contain a statement detailing the reasons for the eviction[.]"  *See also* 14 DCMR § 4302.1(a) ("In order to be valid, a notice to vacate, shall include . . . [a] statement detailing the factual basis on which the housing provider relies . . . .").

---

[11]    We have observed that "the denial of a trial by jury may be harmless error, but this can be true only in very limited circumstances [such as] where the trial court would have been obliged to take the case away from the jury[,]" not in a case where credibility assessments bear on a tenant's defenses. *King*, 928 A.2d at 698–99.

Here, the Notice to Quit stated:

Landlord advises that Tenant is in breach and material noncompliance of the terms and conditions of the Lease due to Tenant's criminal activity at the Property. Specifically, another resident at the Property has notified Landlord of threats made by Tenant and of Tenant's possession of illegal substances with the intent to distribute (both to guests and other residents). Specifically, Landlord has received a report that on or about July 6, 2017, Tenant attempted to gain access into another resident's apartment because she believed there to be drugs in the unit. When the resident refused to allow her inside, Tenant threatened to "fuck up" and "beat [the resident's] ass." The Landlord has also received reports that Tenant is possessing and selling drugs to other residents and has allowed others to use drugs in her apartment, including, but not limited to, crack cocaine.

Appellant argues that the Notice to Quit was inadequate to support the case that St. Martin's has pursued because it alleges a verbal in-person threat made at a resident's door on July 6, 2017, while the evidence presented at trial pertained to a voicemail, left on a possibly different date (see *supra* note 3), that threatened a different harm (a punch in the face rather than a threat to "fuck up" and "beat [the resident's] ass").  With respect to the alleged sales of drugs to other residents, appellant contends that the Notice to Quit was inadequate because it did not identify the "when, where, and who" of the claim.

We disagree with appellant's contentions. In *Scarborough v. Winn Residential, L.L.P.*, 890 A.2d 249 (D.C. 2006), we considered a notice to quit that stated that "on or about December 12, 2002[,] . . . members of the Metropolitan Police Department conducted a search of [the tenant's] apartment and located a gun which was believed to have been involved in [a] homicide" committed on the apartment property the same day and that "[i]n any event, maintaining a gun on the property violates the terms of [the tenant's] lease . . . and is a crime[.]" *Id.* at 252. We rejected the argument that the notice "failed to apprise [the tenant] adequately of the basis for the eviction." *Id.* We reasoned that the fact that the notice did not expressly reference what paragraph of the lease was violated did not render the notice inadequate, and that the reference to maintaining a gun on the property was "sufficient to direct [the tenant] to the District's laws prohibiting possession of unregistered firearms and ammunition" even though the notice did not cite to specific criminal statutes alleged to have been violated. *Id.* at 252 n.2. We said that "[t]he notice met both District of Columbia and federal requirements for notice." *Id.* Thus, the failure of the notice to specify who possessed the gun, what kind of gun it was, where exactly it was found in the tenant's apartment, whether it was registered, whether it was loaded, how long it had been in the apartment, and how police learned of or suspected its presence in the apartment — all of which

were potentially relevant to whether the tenant was in actual or constructive possession of the gun — did not make it legally insufficient.

Here, too, we are satisfied that the Notice to Quit provided enough detail to sufficiently apprise appellant of the criminal activity alleged: a threat to injure a fellow tenant who had refused to allow appellant into the other tenant's unit and the sale of crack cocaine and other drugs to fellow residents. Further, contrary to appellant's argument, the Notice to Quit cannot reasonably be read to state that "all [of] the allegations are alleged to have happened on July 6th[,]" as appellant contends. The reference to the Landlord's receipt of a report "on or about July 6, 2017," regarding appellant's threatening to harm another resident after attempting to gain access to the other resident's unit, was sufficient to apprise appellant of the conduct in issue without necessarily tying the conduct to July 6, 2017. The reference to the landlord's receipt of reports that the tenant "is possessing and selling drugs to other residents" in no way tied the alleged conduct to July 6, 2017, and use of the present tense implied repeated conduct that had occurred most recently around the time of the Notice to Quit. We are not persuaded by appellant's argument that the less-than-careful language that St. Martin's counsel used in his statement to the court on January 26, 2018 ("all of the allegations are alleged to have happened on July 6th") retroactively modified the Notice to Quit

or that appellant was misled or prejudiced by the statement, especially since it was followed by St. Martin's responses to appellant's interrogatories and since appellant's defense team had interviewed Ms. Bumbray even before the January 26, 2018, court appearance.

## IV.

The judgment of the Superior Court is vacated and the matter is remanded for further proceedings.

*So ordered.*