*** FOR PUBLICATION IN WEST'S HAWAI'I REPORTS AND PACIFIC REPORTER ***

**Electronically Filed
Supreme Court
SCWC-13-0000785
06-MAY-2015
09:13 AM**

IN THE SUPREME COURT OF THE STATE OF HAWAI'I

---o0o---

FETU KOLIO,
Petitioner/Appellant/Plaintiff-Appellant,

vs.

HAWAI'I PUBLIC HOUSING AUTHORITY,
Respondent/Appellee/Defendant-Appellee.

SCWC-13-0000785

CERTIORARI TO THE INTERMEDIATE COURT OF APPEALS
(CAAP-13-0000785; CIV. NO. 12-1-2339-09)

MAY 6, 2015

RECKTENWALD, C.J., NAKAYAMA, McKENNA, POLLACK, AND WILSON JJ.

OPINION OF THE COURT BY NAKAYAMA, J.

This appeal concerns Fetu Kolio's (Kolio) eviction from

Mayor Wright Homes (Mayor Wright), a federally-subsidized public

housing project, which is owned and operated by Hawai'i Public

Housing Authority (HPHA).  While living at Mayor Wright, Kolio

served as the president of the Mayor Wright Homes Tenant

Association (Association) and misappropriated approximately $1,400 in Association funds. He later pled guilty to second degree theft. HPHA evicted Kolio from Mayor Wright, alleging that Kolio's theft of Association funds violated a term in his lease that stated: "Tenant . . . shall not engage in . . . any criminal activity . . . that threatens the health, safety or right to peaceful enjoyment of Management's public housing premises by other public housing residents or neighboring residents." On appeal, both the Circuit Court of the First Circuit (circuit court) and the Intermediate Court of Appeals (ICA) affirmed.

On review of the record, HPHA failed to carry its burden of showing that Kolio's theft threatened the health, safety, or peaceful enjoyment of the premises. Additionally, Kolio's theft did not meet the definition of criminal activity given in Hawaiʻi Administrative Rules (HAR) § 17-2020, which governs the practice and procedure for terminating the tenancy of a person occupying a unit in a project that is owned or operated by HPHA. Therefore, we hold that the ICA gravely erred in affirming the Eviction Board, and we reverse the Eviction Board's Order.

## I. BACKGROUND

In 2004, Kolio entered into a rental agreement with

HPHA (Rental Agreement) under which he became a tenant of Mayor Wright, a federally-subsidized housing project.  The project is under the jurisdiction of the U.S. Department of Housing and Urban Development (HUD) and under the ownership and operation of HPHA.  From 2009 until 2011, Kolio served as the President of the Mayor Wright Tenant Association.[1]  On July 27, 2010, Kolio received a check for $1,400 from HPHA to be used for resident participation activities as required by HUD.[2]  In 2011, Kolio failed to comply with HPHA's requests for financial documentation of the Association checking account, and HPHA's Financial Management Office confirmed that the check had been cashed and deposited into Kolio's personal account.  Kolio was charged with Theft in the Second Degree, a Class C felony in January 2012 and he pled guilty to the charge on May 29, 2012.[3]

## A.    HPHA Proceedings

On February 27, 2012, HPHA sent Kolio a Notice of Violation of Rental Agreement and Proposed Termination of Rental

---

[1]     The Association is referred to as a "resident council" by HUD. Pursuant to 24 C.F.R. § 964.18, housing authorities like HPHA must assist residents in establishing and maintaining a resident council upon the request of the residents.  Participation in resident councils is voluntary, and the governing board is democratically elected.  24 C.F.R. § 964.115.

[2]     These funds had been provided to the Association by HUD under 24 C.F.R. § 964.150(a)(1).  These funds were to be used for purposes set forth in 24 C.F.R. § 964.

[3]     As a result, Kolio was sentenced to 30 days of incarceration, five years probation, and directed to pay $1,400 in restitution to HPHA.

Agreement (Non-Rent Violation) (Notice) stating that HPHA would proceed to terminate Kolio's tenancy because he violated, among other sections, Section 8(p)(1) of the Rental Agreement. Section 8(p)(1) stated that it was a tenant's obligation to

> (p) Assure that Tenant, any member of the household, a guest or another person under Tenant control, shall not engage in:
>     (1) Any criminal activity or alcohol abuse that threatens the health, safety or right to peaceful enjoyment of Management's public housing premises by other public housing residents or neighboring residents or employees of Management[.]

The Notice further referred to Kolio's misappropriation of Association funds.

After the parties were unable to settle the dispute through the grievance process prescribed by Hawaiʻi Administrative Rules (HAR) § 17-2021, a hearing was scheduled before the Oahu Eviction Board A of HPHA on September 11, 2012 to determine whether the Rental Agreement should be canceled and terminated due to the alleged violations. In addition to providing evidence of Kolio's theft and his conviction, the Manager's Report to the Eviction Board stated that "Theft in the Second Degree is defined as a felony which constitutes criminal activity in violation of Section 8(p)(1) of the Rental Agreement." The Report also stated that the "Association funds which were to be used solely for the benefit of the individual residents that Mr. Kolio represented, caused mistrust within the community causing a [threat to] health, safety or right to

peaceful enjoyment of Management's public housing premises by other public housing residents or neighboring residents."

Kolio argued that he did not violate Section 8(p)(1) of the lease because that Section referred only to activity that "(1) meets the definition of 'criminal activity' as understood in the context of public housing evictions and (2) 'threatens the health, safety, or right to peaceful enjoyment of the premises' by others." He asserted that the argument that tenant safety and health were threatened because the Association did not possess the stolen funds was purely speculative, and "'[a] legal conclusion should not rest on a foundation of entirely fictitious events.'"

At the hearing, HPHA Project Manager Joanna Renken (Renken) testified that:

> A lot of times, we feel that peaceful enjoyment or, or any kind of threat of health and safety is a lot times physical, but what people don't know [is] that it can also mean emotional as well. So, I'm speaking on behalf of the residents of Mayor Wright Homes, and Mr. Kolio did violate the Rental Agreement.

When responding to a question about what the Association funds were to be used for, Renken stated:

> Usually the resident participation fund is given by the HUD . . . and that specific fund is supposed to be used to generate programs for the residents within the community to gain either employment or anything to make them become self sufficient, or to provide anything that would be a benefit to the residents within the community.

She also testified that the funds Kolio stole were supposed to be

5

used for any kind of services "from computer classes to sewing classes to reading classes, anything that would benefit the, not the association, the residents" and were not for personal use.

In its Findings of Fact, Conclusions of Law, Decision and Order, the Eviction Board found that Kolio violated Section 8(p)(1) of the Rental Agreement and noted that Kolio had held a position of trust and had deprived the Association and residents of "the funds and resources that could have been used for the health, safety and welfare of all the residents . . . ."  The Board ordered that Kolio be evicted.

## B.    Circuit Court Proceedings

Kolio appealed to the circuit court.[4]  Following the notice of appeal, Kolio filed a Motion to Stay Writ of Possession Pending Appeal, which was denied by the circuit court.  Kolio was evicted from his home.  Following oral argument on Kolio's appeal, the circuit court affirmed the Eviction Board's Findings of Fact, Conclusions of Law, Decision and Order.

## C.    Proceedings Before the ICA

Kolio then appealed to the ICA, and the ICA affirmed the circuit court.  The ICA held that:

> Kolio's criminal theft misappropriated [Association funds] that were already allocated and were now unavailable for purposes that included the benefit of the health, safety,

---

[4]    The Honorable Rhonda A. Nishimura presided.

and peaceful enjoyment of the Mayor Wright Housing residents. Kolio's theft thus constituted the kind of criminal activity that posed a "threat" within the meaning of section 8(p)(1) of the Rental Agreement and provided sufficient grounds for the Eviction Order.

## II.   STANDARDS OF REVIEW

## A.   Review of Administrative Agencies' Findings and Conclusions

We review the appeal of an administrative decision for grave errors of law, applying the same standard that the ICA applied:

> Review of a decision made by the circuit court upon its review of an agency's decision is a secondary appeal. The standard of review is one in which [the appellate] court must determine whether the circuit court was right or wrong in its decision, applying the standards set forth in HRS § 91-14(g) [(1993)] to the agency's decision.
>
> HRS § 91-14, entitled "Judicial review of contested cases," provides in relevant part:
>
>> (g)   Upon review of the record the court may affirm the decision of the agency or remand the case with instructions for further proceedings; or it may reverse or modify the decision and order if the substantial rights of the petitioners may have been prejudiced because the administrative findings, conclusions, decisions, or orders are:
>>
>>> (1)   In violation of constitutional or statutory provisions; or
>>> (2)   In excess of the statutory authority or jurisdiction of the agency; or
>>> (3)   Made upon unlawful procedure; or
>>> (4)   Affected by other error of law; or
>>> (5)   Clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; or
>>> (6)   Arbitrary, or capricious, or characterized by abuse of discretion or clearly unwarranted exercise of discretion.
>
> [U]nder HRS § 91-14(g), conclusions of law are reviewable under subsections (1), (2), and (4); questions regarding procedural defects under subsection (3); findings of fact under subsection (5); and an agency's exercise of discretion under subsection (6).

United Pub. Workers, AFSCME, Local 646, AFL-CIO, v. Hanneman, 106 Hawaiʻi 359, 363, 105 P.3d 236, 240 (2005) (quoting Paul's Elec. Serv., Inc. v. Befitel, 104 Hawaiʻi 412, 416, 91 P.3d 494, 498 (2004)).

When determining whether an agency abused its discretion pursuant to HRS § 91-14(g)(6), the court must first "determine whether the agency determination under review was the type of agency action within the boundaries of the agency's delegated authority." Paul's Elec. Serv., 104 Hawaiʻi at 417, 91 P.3d at 499. If the determination was within the agency's realm of discretion, then the court must analyze whether the agency abused that discretion. Id. If the determination was not within the agency's discretion, then it is not entitled to the deferential abuse of discretion standard of review. Id.

In regards to the abuse of discretion standard of review, this court has held that "[a]gency determinations, even if made within the agency's sphere of expertise, are not presumptively valid; however, an agency's discretionary determinations are entitled to deference, and an appellant has a high burden to surmount that deference[.]" Id. at 419, 91 P.3d at 501. This court has further described an agency's proper exercise of discretion as "not arbitrarily or willfully, but with regard to what is right and equitable under the circumstances and

8

the law, and directed by the reason and conscience of the judge to a just result." S. Foods Grp., L.P. v. State, Dep't of Educ., 89 Hawaiʻi 443, 452, 974 P.2d 1033, 1042 (1999) (internal quotations and citations omitted). Therefore, "[a] hearings officer abuses his or her discretion when he or she 'clearly exceeds bounds of reason or disregards rules or principles of law or practice to the substantial detriment of a party.'" Id. (quoting Craft v. Peebles, 78 Hawaiʻi 287, 301, 893 P.2d 138, 152 (1995)).

## III.  DISCUSSION

The issue before the court is whether the Eviction Board abused its discretion when it determined that Kolio's theft constituted criminal activity that threatened the health, safety, or peaceful enjoyment of the premises by other residents or HPHA employees.

## A.   The Determination of the HPHA Eviction Board Was Within Its Realm of Discretion.

This court has held that "[t]he boundaries of an agency's discretion are established by the legislature . . . and these statutory boundaries will likely assist a reviewing court in defining 'discretion' when that court examines an agency's action for an abuse of discretion." Paul's Elec. Serv., 104 Hawaiʻi at 417-18, 91 P.3d at 499-500 (internal citations

omitted). HRS § 356D-94(a)(2006) provides that HPHA has the discretion to terminate a public housing tenancy "[i]f it is proven to the satisfaction of the eviction board that there is cause to terminate a lease or rental agreement and evict the tenant . . . ." HRS § 356D-92(a)(2006) limits this discretion by prescribing the causes for termination of a lease. Relevant to this case, HRS § 356D-92(a)(2) allows for termination if there is a "[v]iolation of any of the provisions of a lease, rental agreement, permit, or license[.]" Additionally, HAR § 17-2020-5(a)(2004)(amended 2014) states that the examiner or eviction board "shall determine whether there are sufficient grounds for termination of the rental agreement[,]" and a "[s]erious or repeated violation of material terms of the rental agreement" is listed as a ground for termination in HAR § 17-2020-5(b)(1).

Pursuant to this legislative authority, it was within the Eviction Board's delegated authority to determine whether Kolio violated the Rental Agreement and to evict him based on its conclusion that he had. See Paul's Elec. Serv., 104 Hawaiʻi at 417, 91 P.3d at 499. Thus, the next step in the analysis is to consider whether the Eviction Board nonetheless abused its discretion by making a determination that was arbitrary or capricious. See HRS § 91-14(g)(6).

10

**B.    The Eviction Board Abused Its Discretion When It Determined that Kolio's Theft Was Criminal Activity that Threatened the Health, Safety, or Peaceful Enjoyment of the Premises.**

Although HPHA is given discretion to determine whether grounds for eviction exist, this discretion is not unlimited. HPHA is required to liberally construe the rules governing eviction practice and procedure so that "the rights of the parties are preserved in a just and timely resolution of every hearing."  HAR § 17-2020-1.  Here, Kolio was evicted from his home and has had to live apart from his wife, who was allowed to remain at Mayor Wright, because neither of them can afford to live outside of public housing.  And even though HPHA has an important interest in maintaining the peace and safety of the projects, HPHA must abide by the rules and provisions that create the boundaries of its discretion, especially where the consequences of its actions are so dire.  In this case, it is clear that HPHA abused its discretion when it found that Kolio's theft violated Section 8(p)(1) of the Rental Agreement.

Section 8 of the Rental Agreement lists obligations of the tenant.  Section 8(p) states that it is a tenant's obligation to "[a]ssure that Tenant . . . shall not engage in: (1) Any criminal activity or alcohol abuse that threatens the health, safety or right to peaceful enjoyment of Management's public housing premises by other public housing residents or neighboring

11

residents or employees of Management[.]"  HPHA is required by HUD to include this tenant obligation in its rental agreements, and the language of Section 8(p)(1) traces the language of 24 C.F.R. § 966.4(f)(12)(i)(A)(2001).[5]  However, neither the Rental Agreement nor HUD regulations define "criminal activity that threatens the health, safety, or right to peaceful enjoyment."

The phrase "that threatens the health, safety, or peaceful enjoyment of the premises" clearly qualifies the kind of criminal activity that violates the provision.  There must be a showing of a nexus between the tenant's criminal activity and the threat to health, safety, or enjoyment of the premises by other residents or management employees.  D.C. Hous. Auth. v. Whitfield, No. 04-LT-410, 2004 WL 1789912, at *6 (D.C. Super. Ct. Aug. 11, 2004)("To hold [that a nexus is unnecessary] would require the court to adopt the position that a public housing agency has blanket authority to evict its residents for any criminal behavior committed anywhere, regardless of whether such behavior posed a threat to the health and safety of the other

---

[5]    24 C.F.R. § 966.4 reads:

   (f) Tenant's obligations.  The lease shall provide that the tenant shall be obligated:
   . . .
      (12)(i) To assure that no tenant, member of the tenant's household, or guest engages in:
         (A) Any criminal activity that threatens the health, safety, or right to peaceful enjoyment of the premises by other residents . . . .

12

residents where the tenant lives . . . [and] allow [a public housing authority] to effectively evict without cause, any person who has a criminal record.").

It appears that Hawaiʻi courts have not defined the language of this provision, nor have they addressed HPHA evictions pursuant to it.[6]  However, because HUD requires the inclusion of this standardized provision in all lease agreements between public housing authorities and tenants of federally-subsidized projects, other jurisdictions have addressed evictions under the same or substantially similar language to Section 8(p)(1).  These cases are instructive as to what a public housing authority must show in order to prove that a tenant violated this provision.

In Guste Homes Resident Management Corp. v. Thomas, Thomas leased an apartment from the Housing Authority of New Orleans, which was managed by Guste and subject to the same HUD

_____

[6]     The closest Hawaiʻi case appears to be Williams v. Hawaiʻi Housing Authority. 5 Haw. App. 325, 690 P.2d 285 (1984).  In that case, the tenants' adult sons were involved in two altercations on project premises, one of which was a fatal stabbing.  Id. at 331, 690 P.2d at 290.  The ICA held that the tenants were properly evicted under a lease provision that required tenants to "cause other persons who are on the premises with his consent to conduct themselves in a manner which will not disturb his neighbors' peaceful enjoyment of their accommodations and will be conducive to maintaining the project in a decent, safe, and sanitary condition . . . ."  Id. at 326, 690 P.2d at 287.  While the case implies that altercations on project premises are conduct that disturbs residents' "peaceful enjoyment" of their accommodations, the ICA noted that the tenants "were evicted not on account of the incidents per se, but because they failed to control the actions of their sons as evidenced by the long list of complaints" preceding and including the two altercations.  Id. at 332, 690 P.2d at 290.

13

regulations under 24 C.F.R. § 966.4. 116 So. 3d 987, 988 (La. Ct. App. 2013). Upon investigation, Guste learned that Thomas had been charged with theft and illegal possession of stolen goods following an incident at the New Orleans Arena. Id. Guste determined that this criminal activity was a breach of the lease agreement and served Thomas with a notice of termination. Id. at 989. At a trial on the merits of the eviction, Guste's evidence of the lease violation consisted of Thomas's misdemeanor theft conviction and the testimony of the property manager. Id. at 988. The trial court concluded that the theft was not a threat to the health, safety, or peaceful enjoyment of the premises. Id. at 989. Although the property manager testified that she believed that Thomas's theft was a threat, when the trial court asked her how it specifically threatened other residents, she was unable to give support for her belief with testimony or evidence. Id. at 991. Although the record indicated that residents reported the theft to Guste after it was exposed by the local news, none of them stated that they felt threatened or concerned for their individual health, safety, or peaceful enjoyment of the premises. Id. at 991-92. The Louisiana Court of Appeal affirmed the trial court's decision holding that evidence of an actual threat was "a necessary element to demonstrate that Mr. Thomas' actions warrant eviction," and Guste failed to meet its burden of

proof to evict Thomas. Id. at 991.

In Sumet I Associates, LP v. Irizarry, the tenant's lease was terminated for "'criminal activity by a tenant . . . that threatens the health, safety, or right to peaceful enjoyment of the premises by other residents.'" 959 N.Y.S.2d 254, 255 (N.Y. App. Div. 2013). The tenant spray-painted graffiti in a common area stairwell. Id. When the tenant failed to vacate the premises, a summary holdover proceeding was brought, and a videotape from the security camera capturing the tenant's vandalism was presented as evidence. Id. The New York Supreme Court held that even though the landlord demonstrated the tenant's criminal activity, because the graffiti was on the stairwell landing leading to the roof and there was no evidence that any resident's peaceful enjoyment was threatened, the landlord failed to demonstrate that the lease term was violated. Id.

In Housing Authority of City of Bangor v. Bush, the housing authority claimed that the tenant's guest violated the same standardized lease provision when he removed a stop sign near the residence. No. AP-00-22, 2001 WL 1719230, at *2 (Me. Super. Feb. 2, 2001). The court held that this criminal activity did not threaten the health, safety, or peaceful enjoyment of the premises by other residents because there was no evidence

15

regarding the environment where the traffic sign had been erected. Id. The court held that although in some circumstances, the removal of a stop sign could pose a threat, in other circumstances, such as in a remote area or on a road closed to traffic, the removal of a stop sign would not be a threat. Id. ("[E]ven though [removal of the sign] was criminal, its effects on others is entirely a function of specific facts not set out in the present record.").

Kolio has cited to Boston Housing Authority v. Bryant, 693 N.E.2d 1060 (Mass. App. Ct. 1998), throughout his appeal in support of his argument that his theft did not threaten the health, safety, or peaceful enjoyment of the premises. In Bryant, the tenant committed larceny by false pretenses when she used the identity of a housing authority employee to apply for credit cards, on which she ran up substantial charges. Id. at 1061. The Boston Housing court ruled that the tenant violated the same HUD standardized lease provision prohibiting criminal activity that threatened the health, safety, or peaceful enjoyment of the premises. Id. HPHA and the ICA majority asserted that Bryant is distinguishable from the present case because the Boston Housing Authority used summary eviction proceedings pursuant to a Massachusetts statute. Id. at 1062. The court in Bryant held that summary proceedings were

16

inappropriate because "the right of peremptory termination of a lease is limited by statute to violations of provisions that forbid crimes that are physically destructive, violent, associated with violence, or visibly asocial[,]" and Bryant's conduct did not fall under this statute.  Id. at 1062-63.  However, while the present case is somewhat distinguishable because there is no comparable Hawaiʻi statute allowing for summary proceedings, Bryant's discussion of the lack of evidence supporting an actual threat is still instructive.  The Boston Housing Court judge reasoned that Bryant's crime was a threat because if the employee's credit had been exceeded and the employee had been unable to use it in an emergency, Bryant's conduct would have threatened the employee's health and safety.  Id. at 1062.  However, the Appeals Court disagreed and reversed the Boston Housing Court stating, "[t]he difficulty with this reasoning is that it rests on a chain of conjecture about hypothetical facts . . . [a] legal conclusion should not rest on a foundation of entirely fictitious events."  Id.

Taken together, these cases all support the conclusion that the mere showing of some criminal activity is not enough to violate this provision; there must be evidence supporting a finding of an actual threat to the health, safety, or peaceful enjoyment of the premises by other residents or management.  A

17

conclusory assertion that the removal of a stop sign is a threat to resident safety, or that graffiti is a threat to peaceful enjoyment, or that one resident's theft is a threat to the health and safety of the others is not enough.  If it were enough, a violation of the provision could rest on a public housing authority's assumption of facts and circumstances not in the record and would render the limiting phrase "that threatens the health, safety, or peaceful enjoyment of the premises" inoperative.  Almost any criminal activity could hypothetically pose a threat to others.  Whether criminal activity actually threatens health, safety, or peaceful enjoyment of the premises is a fact-driven analysis, and there must be evidence to support these facts.

In this case, the evidence supporting a conclusion that Kolio's theft threatened the health, safety, or peaceful enjoyment of the premises was limited to Manager Renken's report to the Eviction Board asserting that Kolio's theft caused mistrust within the community and Renken's oral testimony at the eviction hearing about what the funds could have been used for.[7]  However, there was no evidence of any tenant who reported feeling threatened by Kolio's theft.  Additionally, there was no evidence

---

[7]    See supra Part I.A regarding Renken's testimony at the eviction hearing.

18

as to what kind of programs the funds had been used for in the past or what programs were planned but then canceled due to the absence of funds.  It cannot be assumed that Kolio's theft was or would have been a threat, and HPHA failed to carry its burden of proving that Kolio violated Section 8(p)(1) of the Rental Agreement.

Therefore, although the HPHA Eviction Board was acting within its realm of discretion when it determined that Kolio's theft violated Section 8(p)(1) of the Rental Agreement, there was no evidence on which they could have reasonably relied in making that determination.  An assumption that Kolio's theft was a threat, without supporting factual evidence, is not enough.  Therefore, the ICA gravely erred in affirming the Eviction Board's Order because the Eviction Board abused its discretion.

Furthermore, as a matter of public policy, it should be noted that administrative agencies are bound to abide by the administrative rules that govern that particular agency.  Here, HAR § 17-2020 contains the rules governing the practice and procedure for terminating the tenancy of a person occupying a unit in a project that is owned or operated by HPHA.  HAR § 17-2020-1.  A definition of criminal activity can be found in HAR § 17-2020-2.  Although the definition was changed in 2014, the definition of criminal activity at the time that Kolio was

19

evicted stated the following:

> "Criminal activity" means the tenant, any member of the tenant's household, a guest or another person under the tenant's control has engaged in:
> (1) the illegal manufacture, sale, distribution, or use of a drug, or the possession of a drug with intent to manufacture, sell, distribute, or use the drug; or
> (2) any illegal activity that has as one of its elements the use, attempted use, or threatened use of physical force substantial enough to cause, or be reasonably likely to cause, serious bodily injury or property damage; regardless of whether there has been an arrest or conviction for such activity and without satisfying the standard of proof used for a criminal conviction.

HAR § 17-2020-2 (effective 2004-2014). Kolio's misappropriation of Association funds did not involve drugs or the use of force, and accordingly, it did not constitute criminal activity for which Kolio could have been evicted under the rules controlling evictions by HPHA.

## IV.  CONCLUSION

In conclusion, the Eviction Board erred when it held that Kolio violated the Rental Agreement. Accordingly, we reverse the ICA's June 25, 2014 judgment on appeal, reverse the circuit court's April 12, 2013 judgment, and reverse the HPHA's September 21, 2012 Findings of Fact, Conclusions of Law, Decision and Order.

Philip W. Miyoshi  
for petitioner  

Craig Iha, John C. Wong,  
Diane K. Taira and  
Jennifer R. Sugita  
for respondent  

/s/ Mark E. Recktenwald  

/s/ Paula A. Nakayama  

/s/ Sabrina S. McKenna  

/s/ Richard W. Pollack  

/s/ Michael D. Wilson  



20