**Electronically Filed
Supreme Court
SCAP-23-0000540
08-APR-2025
08:00 AM
Dkt. 17 OP**

IN THE SUPREME COURT OF THE STATE OF HAWAIʻI

---oOo---

_____

BLOSSOM BELL, Appellant-Appellee,

vs.

HAWAIʻI PUBLIC HOUSING AUTHORITY, Appellee-Appellant.
_____

SCAP-23-0000540

APPEAL FROM THE CIRCUIT COURT OF THE FIRST CIRCUIT
(CAAP-23-0000540; CIV. NO. 1CCV-23-0000240)

APRIL 8, 2025

RECKTENWALD, C.J., McKENNA, EDDINS, GINOZA, AND DEVENS, JJ.

OPINION OF THE COURT BY McKENNA, J.

## I.  Introduction

At issue in this case is whether a long-term public housing tenant, Blossom Bell ("Bell"), "cured" violations of her rental agreement with the Hawaiʻi Public Housing Authority ("HPHA") by forbidding her son-in-law from visiting her at her public housing complex after he assaulted another tenant.  The rental agreement made Bell responsible for the criminal conduct of her guests.  Her son-in-law Daniel Lambert ("Lambert"), a guest,

physically assaulted and severely injured Bell's downstairs neighbor, Aaron George ("George").  Immediately after the assault, Bell forbade Lambert from returning to her unit, and Lambert has never returned.  The Oahu Eviction Board ("Board") still terminated Bell's rental agreement and evicted her.

In an initial appeal, the Circuit Court of the First Circuit ("circuit court")[1] ruled that the Board applied the wrong legal authority to Bell's eviction proceeding and remanded the case for a new hearing.  On remand, the parties agreed that the curability of Bell's violation would be governed by certain notification requirements in the rental agreement.  At the remand hearing, the Board again ruled that Bell's violation was incurable and evicted her.  In a second appeal, the circuit court ruled that Bell had cured the violation, reversed the Board's eviction order, and reinstated Bell's lease.  HPHA appealed the circuit court's decision to the Intermediate Court of Appeals ("ICA"), and the appeal was transferred to this court.

For the reasons below, we hold that the circuit court properly ruled that the Board erred, abused its discretion, and acted arbitrarily and capriciously in evicting Bell on the basis that her act of immediately and permanently barring Lambert from

---

[1]   The Honorable James H. Ashford presided.

visiting her public housing unit could not, and did not, cure the violations of her rental agreement.  We therefore affirm the circuit court's September 7, 2023 final judgment reinstating Bell's lease.

## II.  Background

### A.  The stipulated facts

The parties have stipulated to all of the facts.  The first ten paragraphs of their stipulation set forth the relevant sections of a rental agreement between Bell and HPHA as follows:

> 1.  [Bell] resides at the [HPHA's] dwelling unit at [Hale Laulima] under a Rental Agreement executed by [Bell] with the [HPHA] dated September 22, 2016, including several Supplemental Rental Agreements covering a period up to and including the present.
>
> 2.  Section 8(a) of the Rental Agreement states: (a) Tenant may have guests and visitors without prior written Property Management Office's consent on a limited basis not to exceed one (1) night.  For periods exceeding one (1) night, prior written Management consent is required.  Tenant is required to obtain temporary passes for their guests and visitors to enter the premises or Project.  Tenant's failure to obtain prior consent from Management as required under this Paragraph 8 for use and occupancy of dwelling unit may result in termination of this Rental Agreement.
>
> 3.  Section 8(b) of the Rental Agreement states: (b) Tenant shall be responsible for the conduct of Tenant's guests and visitors while they are on the premises, and may be subject to rental agreement termination for failure to ensure that their guests and visitors do not: (1) Engage in the illegal use of a drug or give Management reasonable cause to believe that the illegal use of (or pattern of illegal use) of a drug or abuse (or pattern of abuse) of alcohol may interfere with the health, safety, or right to peaceful enjoyment of the premises by other tenants; (2) Engage in criminal activity that threatens the health, safety, or right to peaceful enjoyment of the premises by other tenants; (3) Engage in any drug-related criminal activity on or off the premises; (4) Threaten the health or safety of an employee, contractor, or agency of the authority of the State; (5) Violate the smoking prohibitions; (6) Flee to avoid prosecution, or custody or confinement after conviction, for a crime, or attempt to commit a crime, that

is a felony under the laws of the place from which the individual flees; (7) Violate a condition of probation or parole imposed under federal or state law; or (8) Engage in willful damage to Management's property.

4.    Section 13(a) of the Rental Agreement states:  Tenant shall not assign the Rental Agreement or sublease the dwelling unit (24 CFR 966.4(f)(1)).

5.    Section 13(b) of the Rental Agreement states:  Tenant shall not provide accommodations for boarders or lodgers (24 CFR 966.4(f)(2)).

6. Section 13(c) of the Rental Agreement states: Tenant shall use the dwelling unit solely as a private dwelling for the Tenant and the Tenant's household as identified in this Rental Agreement, and not to use or permit its use for any other purpose (24 CFR 966.4(f)(3)).

7. Section 13(p) of the Rental Agreement states: [Tenant shall] act, and cause household members, guests and/or visitors to act, in a manner which will not disturb other Tenants' peaceful enjoyment of their accommodations and will be conducive to maintaining the dwelling unit and Project in a decent, safe, and sanitary condition (24 CFR 966.4(f)(11)).

8.    Section 13(q) of the Rental Agreement states: TENANT'S OBLIGATIONS.  Tenant shall assure that no Tenant, member of Tenant's household, guest or visitor of the Tenant or member of the household or any other person under the Tenant's control engages in: (1) any criminal activity or conduct that threatens the health, safety or right to peaceful enjoyment of the premises by other residents; (2) Any drug-related criminal activity on or off the premises; or (3) The use of marijuana, even if its use is pursuant to a lawful prescription under state law.

9.    Section 13(u) of the Rental Agreement states: Tenant shall: Not engage in activity or conduct that threatens the health or safety of an employee, contractor, or agent of Management of the State and assure that no member of the household, or guest, and/or visitor of the Tenant or member of the household threatens the health or safety of an employee, contractor, or agent of Management or the State (Section 17-2028-59(b)(5), HAR).

10.   Section 19(a)(1)(iii) of the Rental Agreement states: TERMINATION OF RENTAL AGREEMENT: Grounds for termination of rental agreement.  Management may terminate the rental agreement only for: (1) Serious or repeated violation of material terms of the Rental Agreement, such as: (iii) Failure to fulfill Tenant's obligations under this Rental Agreement.

(Cleaned up.)  The next seven paragraphs of the stipulation recounted the incident between Lambert and George as follows:

> 11.  The Board finds that on May 12, 2020, [Lambert] was inside [Bell's] unit at approximately 7:00 a.m.
>
> 12.  The Board finds that on May 12, 2020, [George] resided in the unit directly below [Bell's] unit and that George continues to reside in that unit to the present day.
>
> 13.  The Board finds that on May 12, 2020, at approximately 7:00 a.m., George shot water to an area near [Bell's] window to remove a bird nest.
>
> 14.  The Board finds that Lambert was near [Bell's] window at the time that George shot water near said window on May 12, 2020, and the Board further finds that immediately following this, Lambert and George engaged in a verbal argument.
>
> 15.  The Board finds that immediately following the verbal argument on May 12, 2020, Lambert entered George's unit without George's permission and struck George on the head with a baseball bat causing injury to George and requiring hospitalization.
>
> 16.  The Board finds that Lambert spent the night at [Bell's] unit from May 11, 2020 to May 12, 2020 with [Bell's] knowledge and consent.
>
> 17.  The Board finds that Lambert is the son-in-law of [Bell] and that prior to May 12, 2020, Lambert visited [Bell's] unit from time to time where Lambert's daughter then resided.

(Cleaned up.)

The parties also stipulated that, "as a factual matter, Daniel Lambert ('Lambert') departed [Bell's HPHA unit] within twenty-four (24) hours after the May 12, 2020 incident wherein Lambert entered the unit of neighboring tenant [George] and struck George with a baseball bat, and that Lambert has not returned to the Project since that time."

## B.  A brief procedural history

### 1.  Bell's first eviction proceeding

Eight months after the attack, HPHA presented Bell with a "Notice of Violation of Rental Agreement and Proposed Termination of Rental Agreement (Non-Rent Violation) Expedited Grievance" ("Notice of Violation") on January 29, 2021.  The notice summarized Lambert's attack upon George and informed Bell that HPHA would proceed to terminate her tenancy based on violations of Sections 8(a), 8(b), 13(a), 13(b), 13(c), 13(p), 13(q)(1), 13(u), and 19(a)(1)(iii) of her rental agreement.  The notice provided Bell with no information as to the curability or non-curability of the alleged violations.  The notice informed Bell that she could request a grievance hearing, which she did.

After the hearing, HPHA determined that Bell had violated all the sections of her rental agreement cited in the January 29, 2021 Notice of Violation and it forwarded Bell's case to the Board.  The Board also concluded that Bell had violated all the sections cited in the Notice of Violation.

The Board addressed whether Bell's violations were curable and quoted Hawai'i Administrative Rules ("HAR") § 17-2020-33 Section A, B, subsection 1, which states in relevant part:

> (a) The eviction board shall determine whether or not the violation of the rental agreement constitutes a curable or non-curable violation.  A violation is curable if the violation for which the tenant is being referred is a first offense and is not defined as a non-curable violation.

6

> (b) Non-curable violations include:
>     (1) Any violations that threaten the health or safety of the other residents or the authority's employees or representatives;
>     (2) Any drug-related criminal activity or violent criminal activity;
>     (3) Any criminal activity that threatens the health, safety, or right to peaceful enjoyment of the other residents or the authority's employees or representatives. . . .

HAR § 17-2020-33 (eff. 2014).

The Board concluded that this rule provided it with authority to "determine whether or not the violation of the rental agreement constitute[s] a curable or non-curable violation."  The Board determined that Bell's "violation is not curable," and ordered Bell's eviction.  Bell was evicted from her unit around February 2022.

Bell appealed the Board's decision to the circuit court. At issue was whether the Board erroneously applied HAR § 17-2020-33 with regard to curability and should instead have applied the HPHA's Admissions and Continuing Occupancy Policy ("ACOP"), discussed in Section II.B.2 below.  The circuit court ruled that the ACOP's curability provisions applied, and it remanded the case to the Board for rehearing.  No party appealed the circuit court's decision.

## 2.   Bell's second eviction proceeding

On remand, the parties agreed that the "[s]cope of the remand hearing" was as follows:

> The Parties stipulate that on remand, the only question before the Board is as follows:  Whether Lambert's

7

permanent departure from the Project on May 12, 2020 constituted a "cure" or "remedy" of the rental agreement violation(s) for which Tenant was ultimately ordered evicted in the February 9, 2022 order.  At the remand hearing, the Board shall apply the provisions of Chapter 12, Section C of the Admissions and Continued Occupancy Policy as they relate to curability. . . .

Thus, on remand, the parties stipulated that whether Bell's violations were curable would be decided under Chapter 12 ("Rental Agreement Terminations"), Section C ("Notification Requirements") of the ACOP, which states that "[t]enants shall be notified of specified time to remedy the violation as follows:" and contains the following chart:

| TYPE OF VIOLATION | TIME TO REMEDY |
|---|---|
| Any member of the household has ever been convicted of drug-related criminal activity for the manufacture or production of methamphetamine on the premises of federally assisted housing | 0 days |
| Any drug related criminal activity on or off the project premises | 0 days |
| Any member of the household has been convicted of a felony | 0 days |
| Where tenant has received notice from the United States Department of Housing and Urban Development that the tenant is no longer eligible to remain in the unit | 0 days |
| A history of chronic violations of any material term of the Rental Agreement (Chronic is defined as 3 notices of violation of the same provision of the Rental Aagreement issued to the tenant within a 12 month period.) | 0 days |
| A history of chronic rent delinquency.  (Chronic is defined as 3 notices of violation of the same provision of the rental agreement issued to the tenant within a 12 month period.) | 0 days |
| Any violation of any provision of the Rental Agreement that potentially threatens the health or safety of other residents or the Corporation's employees or their representatives (ex. Fire hazards, slip and falls, unsanitary conditions, vicious animals, etc.) | 24 Hours |
| Non payment or failure to pay rent when due | 14 Days |
| Any Other Violation | 30 days in all other cases unless management can justify the deviation from the 30 days |

8

At the Board hearing, Bell argued that her violation fell within the seventh category above: "Any violation of any provision of the Rental Agreement that potentially threatens the health or safety of other residents"; therefore, she had 24 hours to cure the violation, and she did cure the violation because Lambert left the property well within 24 hours and never came back.

HPHA counter-argued that "there is nothing in [the ACOP] that says the Board is required to treat this particular violation as curable or having been cured." HPHA argued that, after Lambert assaulted George, "the damage was done and even if the Board is to consider this violation to have been curable, the fact of Mr. Lambert's departure doesn't . . . fix anything." HPHA appeared to argue that Bell's violation was not curable because curing the violation would require the incident to be "undone somehow."

Bell replied that only the first six violations listed on page 12-6 of the ACOP were uncurable, because they list the "Time to Remedy" as "0 days." Bell again argued that her violations did not fall under those first six categories and, therefore, must be curable. Bell argued that there was nothing more she could have done to cure the violation than to have Lambert leave the property and never come back.

When pressed by the Board Chair to refer to the violation types under the ACOP, HPHA argued that the seventh category of violations "potentially threatening the health and safety of other residents" did not apply because the point of potentiality had passed when Lambert assaulted George.  HPHA argued that Bell's violation fell within the ninth category of the ACOP ("Any Other Violation"), for which a 30-day "time to remedy" applied, unless management justified a deviation.  HHPA argued that "management has justified deviation from 30 days and that the appropriate time is, in fact, zero days, zero minutes." This was because sections 8 and 13 of the rental agreement required Bell to assure that her guest did not engage in conduct that threatened the safety of other residents, and that section 19 of the rental agreement required HPHA to seek immediate termination for violations of those provisions.

The Board announced its decision at the end of the hearing:

> [W]here we do find that Ms. Bell has, in fact, cured the potential harm that is – that was addressed by removing Mr. Lambert from the situation, we do not agree that this was the cure that was envisioned.  We find that Ms. Bell is still in violation of that provision of the ACOP referring to any other violation.
> . . . .
> [T]he Board finds that the eviction should stand. . . .

The Board then filed its January 24, 2023 "Order Re Remand Hearing Held December 15, 2022."  The Board entered the following conclusions of law:

> 3.  Pursuant to the Circuit Court Order and the Parties' stipulated order, Chapter 12 of the Authority's Admissions

10

and Continued Occupancy Policy ("ACOP") is applicable in this matter as it relates to curability.

4.   The Board concludes that Tenant has engaged in conduct such that Tenant has violated Rental Agreement ("RA") Section(s) 8(a), 8(b), 13(a), 13(b), 13(c), 13(p), 13(q)(1), 13(u), and 19(a)(1)(iii).

5.   The Board concludes that Lambert was a guest of Tenant during the relevant period and for all relevant purposes described herein and particularly within the meaning of RA section 13(q)(1).

6.   Paragraph 19(b) of the RA requires management to seek immediate termination of the rental agreement following certain types of violations, including Tenant's violation in this matter.

7.   The ACOP expressly contemplates situations wherein the Authority is required to seek immediate termination of the Rental Agreement after a single violation, and such situations include, but are not limited to, the "0 Days" situations enumerated on page 12-6 of the ACOP.

8.   Where a particular Rental Agreement violation is curable, and where the ACOP both applies and is silent on the question of how a Tenant may successfully cure the Rental Agreement violation, the question of what action constitutes a successful cure is one for the Board.

9.   On the question of whether Tenant successfully cured her violation, the Board concludes that Tenant's removal of Lambert from the property shortly after the violation did not amount to a cure or remedy of the rental agreement violation(s) for which Tenant was ultimately ordered evicted.  The violation of the RA includes Lambert's unauthorized entry in Aaron George's ("George") unit and physical assault of George which resulted in severe physical injuries to George.  The only way that the result of Lambert's actions could have been cured or remedied would have been for Lambert to "un-enter" George's unit and to "un-assault" George, both factual impossibilities.  Had the violation merely encompassed Lambert's unauthorized presence on the property, then Tenant's removal of Lambert would have been the cure to such violation.  However, Tenant's removal of Lambert from the property has done nothing and could not have done anything to cure or remedy his unauthorized entry of George's unit or his physical assault of George or George's severe physical injuries.

10.  Pursuant to paragraph #4 of the Parties' stipulated order, the requirements of the Circuit Court Order have been fully met by this Board's addressing the question of whether Lambert's permanent departure from the Project on May 12, 2020 constituted a 'cure' or 'remedy' of the rental agreement violation(s) for which Tenant was ultimately ordered evicted.

11

The Board thus re-adopted its order evicting Bell.

On February 23, 2023, Bell appealed the Board's decision to the circuit court.  Bell argued her case fell under the seventh ACOP category (violations that "potentially threaten the health or safety of other residents"); therefore, she had 24 hours to cure the violation, and she did, in fact, cure the violation because Lambert never entered Hale Laulima again.  HPHA's counsel argued that while it was possible that Bell had cured the seventh type of ACOP violation by having Lambert leave and never return to the property, Bell nonetheless could not cure, and did not cure, the ninth type of ACOP violation ("any other violation") because she could not undo Lambert's assault upon George.

On September 6, 2023, the circuit court filed its "Order Reversing the Decision and Order by the Eviction Board, Dated December 15, 2022, and Reinstating Appellant's Rental Agreement" ("Order").  The circuit court made the following relevant rulings:

> 2.  [Bell's] violation of her rental agreement is curable. In paragraph 9 of its January 24, 2023, Order Re Remand Hearing Held December 15, 2022 (the Order), the Board implicitly found that [Bell's] violation of the Rental Agreement is non-curable.  The Court reaches this conclusion based on the language in paragraph 9 of the Order, in which the Board stated that the only way to cure the result of Mr. Lambert's actions would have been for Mr. Lambert to un-enter or un-assault Mr. George, which the Board acknowledged are factual impossibilities.  The Court finds that the Board[']s implicit conclusion is unsupportable.

12

3.  As an initial matter, [Bell] did not enter Mr. George's unit, and [Bell] did not assault Mr. George.  Therefore, [Bell] cannot have violated her Rental Agreement via the entry and assault, neither of which she committed.  Therefore, the fact that Mr. Lambert's entry and assault cannot be undone are not determinative or whether [Bell's] violation can be cured.

4.  [Bell's] violation of her Rental Agreement was allowing Mr. Lambert to come onto the project grounds.  That violation is clearly curable.  Moreover, [Bell's] violation of allowing Mr. Lambert onto the premises was undeniably cured in less than 24 hours, when she ordered Mr. Lambert to stay off the property and not come back, which instruction the parties agree Mr. Lambert has complied with ever since the instruction was given.  Thus, the Board[']s conclusion that [Bell's] violation cannot be cured because Mr. Lambert cannot un-enter and cannot un-assault is incorrect, as the conclusion focuses on the wrongs of Mr. Lambert, and not on the violation by [Bell].

5. Under the Terms of the ACOP, [Bell's] violation is not non-curable.  In addition to the above, ACOP Chapter 12, section C specifies nine types of violations by tenants under their rental agreements.  [HPHA] admits and the Court finds as undisputed that [Bell's] violation of the Rental Agreement cannot possibly fall within the description of any of the first six, or the eighth, of those enumerated violations.  Therefore, the only possible type of violation articulated by ACOP Chapter 12, section C that [Bell's] violation can be considered is either the seventh type of violation (any violation of any provision of the Rental Agreement that potentially threatens the health or safety of other residents), or the ninth type of violation (any other violation).  The ACOP specifies the time to remedy those two types of violations as 24 hours, and 30 days in all other cases unless management can justify the deviation from the 30 days, respectively.  The ACOP's determination that both of those types of violations have time frames within which to remedy the violations establishes that such violations are, in fact, curable.  For this reason, as well as the Board[']s flawed analysis which confused Mr. Lambert's misconduct with [Bell's] violation, the Court again finds the Board[']s determination is unsupportable.

6.  Contrary to its implicit finding, the Board also found that [Bell's] violation was curable, but the Board was not satisfied by [Bell's] cure.  In paragraph 9 of the Order, the Board stated that [Bell's] removal of Mr. Lambert from the property shortly after the violation did not amount to a cure.  This apparently refers to the Chairperson[']s oral ruling at the hearing, in which the Chairperson stated that although the Board found that [Bell] has, in fact, cured the potential harm that was addressed by removing Mr. Lambert from the property, the Board nevertheless concluded that removing Mr. Lambert from the property was not the cure that was envisioned. . . .

13

7.  Thus, the Board acknowledged that [Bell] had, in fact, cured the violation of having Mr. Lambert on the property, because his presence potentially threatened the health or safety of other residents; but the Board was not satisfied with that cure.  Instead, the Board found that Mr. Lambert's wrongdoing (unauthorized entry and assault) could not be cured by [Bell].  From this, it is apparent that the Board did, by its own words, find [Bell's] violation curable, and further found that [Bell] did cure her violation.  Having found that [Bell] cured her violation, the Board erred in nevertheless re-adopting the Order of Eviction.  The fact that the Board envisioned a remedy for the irremediable wrongdoing by Mr. Lambert does not justify ignoring the fact that [Bell] cured her violation within 24 hours of the violation.

8.  [Bell's] violation was curable.  The Court finds that [Bell's] violation is the seventh type of violation (any violation of any provision of the Rental agreement that potentially threatens the health or safety of other residents).  As previously stated, [Bell's] violation was allowing Mr. Lambert onto the property.  That is because his presence potentially threatened the health or safety of residents, as was evidenced by his eventual misconduct.  Therefore, the Court finds that to the extent the Board found [Bell's] violation not to be curable, the Board erred.

9.  If [Bell's] violation was not the seventh type of violation, it was the ninth type of violation.  As previously stated, only the seventh and ninth types of violations enumerated by ACOP Chapter 12, section C can possibly apply to [Bell's] violation.  If her violation was not the seventh type, then it necessarily was the ninth type of violation.  According to the ACOP, any other violation can be cured in 30 days, unless management can justify the deviation from the 30[-]day period.  Whether it was curable in 30 days or was curable in something less than 30 days, it was still curable.  Here, no justification has been argued or shown to deviate from the 30 days. [Bell] removed Mr. Lambert from the property immediately, in less than 24 hours, and he has never returned.  Once the violation was committed, [Bell] could not realistically have addressed the violation any faster.  Therefore, there is no justification for reducing the cure time to anything sooner than [Bell] provided.

The circuit court thus "ordered, adjudged, and decreed that the Board[']s Decision re-adopting the Order of Eviction is clearly erroneous in view of the reliable, probative and substantial evidence on the whole record, and is arbitrary and characterized

14

by an abuse of discretion."  The circuit court reversed the Board's decision on the basis that Bell's "violation was curable and was timely cured."  The circuit court reinstated Bell's rental agreement as well.

On September 7, 2023, the circuit court entered final judgment pursuant to its Order.  HPHA appealed, and on May 17, 2024, we accepted a transfer of the appeal from the Intermediate Court of Appeals ("ICA").[2]

## C.  The parties' arguments on appeal

### 1.  HPHA's opening brief

In its opening brief, HPHA argues that (1) Lambert's assault constituted a violation of sections 8(b) and 13(q) of Bell's rental agreement (requiring her to assure that her guests do not engage in any criminal activity or conduct that threatens the health, safety, or right to peaceful enjoyment of the premises by other residents), and such a violation would result in immediate termination under section 19 of the rental agreement (i.e., zero days to cure); and (2) Lambert's departure did not, and could not, cure the violation.

HPHA relies heavily upon Department of Housing and Urban Development v. Rucker, 535 U.S. 125 (2002), for the proposition

---

[2]     We note that on February 13, 2024, the ICA denied HPHA's December 5, 2023 motion for a stay pending appeal and terminated its own December 7, 2023 order temporarily staying the circuit court's final judgment while it considered HPHA's motion.  Thus, pending this appeal, the circuit court's final judgment reinstating Bell has been effective.

that a public housing authority may evict a tenant due to her guest's criminal conduct, regardless of whether the tenant could foresee the guest's criminal conduct. HPHA acknowledged that the Rucker case "focused on drug-related criminal activity" but argued that it applied with equal force to other criminal activity. HPHA also argued that the circuit court could not have revisited the issue of whether Bell's violation was based on Lambert's actions because the parties had stipulated on remand that the "only question before the Board [wa]s as follows: Whether Lambert's permanent departure from the Project on May 12, 2020 constituted a 'cure' or 'remedy' of the rental agreement violation(s) for which Tenant was ultimately ordered evicted in the February 9, 2022 order."

HPHA reiterates its argument that the violation was the ninth type of ACOP violation ("any other violation"), for which a 30-day time to cure applies, unless there is justification for deviating from that time period. HPHA again argues that the Board's cure time of zero days was a proper deviation, justified by Lambert's completed violent criminal act. HPHA relies on Scarborough v. Winn Residential L.L.P./Atlantic Terra Apartments, 890 A.2d 249 (D.C. 2006), to support its position that a public housing authority can evict a tenant for a "one-strike," "no-fault" violation of a rental agreement with no opportunity to cure. In that case, HPHA explained, a tenant's

16

boyfriend committed a fatal shooting, and his loaded shotgun was found in the tenant's unit.  The tenant removed her boyfriend from the unit and was not aware that the shotgun was still there.  Nevertheless, the tenant was evicted and afforded no opportunity to cure the violation.  HPHA argues that in Scarborough, the District of Columbia Court of Appeals "rejected the tenant's argument that she should have been permitted to cure her violation and on the basis of criminal activity and affirmed her eviction."

HPHA also emphasizes that the Board "exercised its expertise and experience in regard to evictions of federal housing tenants and was well within its discretion to conclude that Bell failed to cure her rental agreement violation based on Lambert's criminal activity and therefore, the Board's decision is entitled to deference and Bell has not met the high burden to surmount that deference."  HPHA cited to Kolio v. Hawaii Public Housing Authority, 135 Hawai'i 267, 349 P.3d 374 (2015).  HPHA therefore asks this court to affirm the Board's order.

**2.  Bell's answering brief**

In her answering brief, Bell counter-argues that (1) lease violations involving criminal activity by a tenant's guest do not necessitate eviction of a non-offending public housing tenant; (2) the ACOP is HPHA's policy governing public housing evictions, and the circuit court properly concluded that Bell

17

cured her violation under the ACOP; and (3) the circuit court properly concluded that HPHA abused its discretion in re-adopting the order of eviction.

Bell first distinguishes Rucker on the basis that it dealt with an Anti-Drug Abuse Act eviction provision involving drug-related criminal activity, which is not at issue in this case. Further, Bell points out that post-Rucker HUD guidance still affords public housing authorities some discretion in deciding whether to evict tenants for even drug-related criminal activity; eviction is not automatic. Bell analogizes her case to one such post-Rucker case, Housing Authority of Covington v. Turner, 295 S.W.3d 123 (Ky. Ct. App. 2009), in which a tenant faced eviction based on the drug-related criminal activity of her nephew, who did not live in the unit but did visit the tenant periodically. Bell explains that Turner recognized that states and local authorities retain discretion to decide whether to evict a tenant for drug-related criminal activity. According to Bell, Turner therefore "affirmed the lower court's decision that the tenant remedied the breach of her lease 'when she prohibited her nephew from further entrance into her apartment.'" Turner, 295 S.W.3d at 128.

Bell next argues that the Board was bound by federal law to follow the ACOP, and the circuit court also ordered it to follow the ACOP on remand. She argues that, in this case, the seventh

ACOP violation type applies and that she had 24 hours to cure, which she did.

To further evidence the Board's abuse of discretion, Bell points out that at her first Board hearing, her violation was characterized as one that "threatens the health or safety of other residents," which sounds like the seventh ACOP violation type, but at the Board hearing on remand, she was evicted because she had not cured, and could not cure, the ninth ACOP violation type ("any other violation").  Bell characterizes this shift as an "abuse of discretion to affect [HPHA's] desired outcome on remand."

Bell argues that HPHA "seems to intentionally conflate the conduct of Lambert with the violation of Bell"; she argues that the circuit court correctly concluded that Bell's "violation was allowing Mr. Lambert onto the property," and such violation was curable and cured when Bell forbade Lambert from ever returning to the property.

Lastly, while Bell acknowledges that an agency like HPHA possesses "discretion to determine whether grounds for eviction exist," Kolio said that "this discretion is not unlimited." Kolio, 135 Hawai'i at 272, 349 P.3d at 379.  Under Kolio, the HPHA "is required to liberally construe the rules governing eviction practice and procedure," especially where the consequences – like eviction – are "dire."  Id.  Kolio also

noted that HPHA Rental Agreements, HUD regulations, and Hawai'i courts have not defined the provision "'criminal activity that threatens the health, safety, or right to peaceful enjoyment of the premises by other residents. . . .'"

Bell notes that the closest our appellate courts have come to addressing criminal activity in HPHA projects is Williams v. Hawai'i Housing Authority, 5 Haw. App. 325, 690 P.2d 285 (1984). In that case, public housing tenants were evicted for failing to control two of their household members (adult sons) who were involved in multiple criminal incidents spanning multiple years and culminating in a fatal stabbing. 5 Haw. App. at 331-32. Unlike the tenants in Williams, Bell argues her individual was a guest, there was only one incident, and the offending individual was immediately and permanently removed from the premises. Bell argues that the Board acted arbitrarily and capriciously and abused its discretion in determining that Lambert's departure did not cure Bell's violation because Lambert could not un-assault George.

### 3. HPHA's reply brief

HPHA's reply brief argues that Rucker requires public housing authorities to immediately seek to evict tenants for the criminal acts of their guests, and the HPHA appropriately exercised its discretion in determining Bell's violation was uncurable and ordering her eviction. HPHA argues that Rucker's

20

holding applies to criminal activity in general and not just to drug-related criminal activity.  Rucker further provides public housing authorities with the discretion to consider all of the circumstances of an eviction case, which HPHA argues it did when it considered whether Lambert's departure could truly cure the assault upon George.

HPHA also criticizes Bell's statements as to the ACOP's applicability to her case.  HPHA argues these arguments are waived because they were made in HPHA's reply brief, and the parties stipulated to using the ACOP's cure provisions in their remand hearing before the Board.  HPHA then argues that the Board properly applied the ACOP in this case.

Lastly, HPHA argues that Kolio is distinguishable because it held that a tenant's theft of community funds bore no nexus to threatening the health and safety of public housing residents, whereas Lambert's assault of George did.  HPHA also distinguishes Williams on the basis that it predated the Anti-Drug Abuse Act of 1988, which required public housing leases to have provisions (like paragraphs 8 and 13 in Bell's lease) requiring tenants to assure that their household members or guest did not threaten the health and safety of other residents.  According to HPHA, Bell's violation was Lambert's attack on George, which could not be cured.

### III. Standard of Review: Agency Appeals

"Review of a decision made by the circuit court upon its review of an agency's decision is a secondary appeal. The standard of review is one in which this court must determine whether the circuit court was right or wrong in its decision, applying the standards set forth in HRS § 91-14(g) . . . to the agency's decision." Dep't of Env't Servs., City & Cnty. of Honolulu, v. Land Use Comm'n, 127 Hawai'i 5, 12, 275 P.3d 809, 816 (2012) (citation omitted).

HRS § 91-14(g) (2012 & Supp. 2016), in turn, provides the following standards:

> (g) Upon review of the record the court may affirm the decision of the agency or remand the case with instructions for further proceedings; or it may reverse or modify the decision and order if the substantial rights of the petitioners may have been prejudiced because the administrative findings, conclusions, decisions, or orders are:
> (1) In violation of constitutional or statutory provisions;
> (2) In excess of the statutory authority or jurisdiction of the agency;
> (3) Made upon unlawful procedure;
> (4) Affected by other error of law;
> (5) Clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; or
> (6) Arbitrary, or capricious, or characterized by abuse of discretion or clearly unwarranted exercise of discretion.

Pursuant to HRS § 91-14(g), an agency's conclusions of law are reviewed de novo, Camara v. Agsalud, 67 Haw. 212, 216, 685 P.2d 794, 797 (1984), while an agency's factual findings are reviewed for clear error, HRS § 91-14(g)(5).

> In order to preserve the function of administrative agencies in discharging their delegated duties and the function of this court in reviewing agency determinations, a presumption of validity is accorded to decisions of

22

> administrative bodies acting within their sphere of
> expertise and one seeking to upset the order bears "the
> heavy burden of making a convincing showing that it is
> invalid because it is unjust and unreasonable in its
> consequences."

In re Haw. Elec. Light Co., 60 Haw. 625, 630, 594 P.2d 612, 617
(1979) (citations omitted).

### IV.  Discussion

Federal law has not expressly preempted state law eviction proceedings or state law defenses to public housing evictions. Robert Hornstein, Litigating around the Long Shadow of Department of Housing and Urban Development v. Rucker:  The Availability of Abuse of Discretion and Implied Duty of Good Faith Affirmative Defenses in Public Housing Criminal Activity Evictions, 43 U. ToL. L. REV. 1, 24 (2011) ("Litigating Around Rucker").  Rucker still provides a useful framework for analyzing whether the Board erred and/or abused its discretion in ruling that Lambert's attack could not, and did not, cure Bell's rental agreement violations.

Rucker explains the genesis of provisions like sub-sections 8 and 13 in Bell's rental agreement, which required her to assure her guest does not engage in criminal activity or otherwise threaten the health and safety of project residents. Rucker states, "With drug dealers[3] 'increasingly imposing a reign

---

[3]    While the statute at issue in Rucker (42 U.S.C. § 1437d(l)(6)) was passed during the War on Drugs, it is not accurate to say that the statute (and the Rucker case interpreting it) deal only with drug-related criminal activity.  The statute itself requires tenant leases to state that tenants

of terror on public and other federally assisted low-income housing tenants,' Congress passed the Anti-Drug Abuse Act of 1988." 535 U.S. at 127. The Act, (42 U.S.C. § 1437d(l)(6), as later amended), provides that each "public housing agency shall utilize leases which . . . provide that any criminal activity that threatens the health, safety, or right to peaceful enjoyment of the premises by other tenants or any drug-related criminal activity on or off such premises, engaged in by a public housing tenant, any member of the tenant's household, or any guest or other person under the tenant's control, shall be cause for termination of tenancy." Id. See also 24 C.F.R. § 966.4(f)(12)(i) (2025) (also requiring public housing rental agreements to contain provisions requiring tenants "[t]o assure that the tenant, any member of the household, a guest, or another person under the tenant's control, shall not engage in: (A) Any criminal activity that threatens the health, safety, or right to peaceful enjoyment of the PHA's public housing premises by other residents or employees of the PHA, or (B) Any drug-related criminal activity on or near such premises. Any criminal activity in violation of the preceding sentence shall

---

are responsible for the criminal acts (including drug-related criminal acts) of themselves, members of their household, or their guests and others under their control. Rucker has thus been applied to factual circumstances involving non-drug-related criminal activity by third parties that formed the basis for efforts to evict tenants in public housing and federally subsidized housing.

be cause for termination of tenancy, and for eviction from the unit.").

While the term "criminal activity" itself is not defined, the C.F.R.s do define "[d]rug-related criminal activity" and "[v]iolent criminal activity."  "Drug-related criminal activity" means "the illegal manufacture, sale, distribution, or use of a drug, or the possession of a drug with intent to manufacture, sale, distribute or use the drug."  24 C.F.R. § 5.100 (2024). This term is inapplicable here.  "Violent criminal activity" means "any criminal activity that has as one of its elements the use, attempted use, or threatened use of physical force substantial enough to cause, or be reasonably likely to cause, serious bodily injury or property damage."  Id.  This term does apply in this case.

In Rucker, four elderly public housing tenants in Oakland were evicted from their public housing units due to drug-related criminal acts of family members listed on the lease and, in the case of one tenant, guests.  535 U.S. at 128.  None of the tenants knew of, or had reason to know of, the drug-related criminal activities committed by their family members or guests. 535 U.S. at 130.  The federal district court enjoined the evictions, and a panel of the Ninth Circuit Court of Appeals reversed the district court.  Id.  The Ninth Circuit, sitting en banc, then reversed the panel and affirmed the district court.

25

Id.  The United States Supreme Court granted certiorari and held that "42 U.S.C. § 1437(d)(l)(6) unambiguously requires lease terms that vest local public housing authorities with the discretion to evict tenants for the drug-related activity of household members and guests whether or not the tenant knew, or should have known, about the activity."  Id.

Rucker noted that evicting a tenant who was without knowledge of the drug-related activity imposed "strict liability" upon the tenant and constituted a "no-fault" eviction, but it also noted that such evictions are not "absurd" and are "a common 'incident of tenant responsibility under normal landlord-tenant law and practice.'"  535 U.S. at 134. The Court also pointed out, however, that "[t]he statute does not *require* the eviction of any tenant who violated the lease provisions.  Instead, it entrusts that decision to the local public housing authorities, who are in the best position to take account of, among other things, the degree to which the housing project suffers from 'rampant drug-related or violent crime,' 'the seriousness of the offending action,' and 'the extent to which the leaseholder has . . . taken all reasonable steps to prevent or mitigate the offending action.'"  535 U.S. at 133-34 (citations omitted).

Post-Rucker, Hornstein noted the tension between (1) the Court's imposition of "strict liability" upon tenants, with (2)

26

the Court's recognition of the public housing authority's ability to take the circumstances of the eviction into account. See Litigating Around Rucker, supra at 11.  For example, some state courts evict non-offending tenants for the criminal acts of third parties without regard to the circumstances surrounding the criminal acts.  The case from the District of Columbia Court of Appeals HPHA relies upon, Scarborough, 890 A.2d 249, is one such example.  Other jurisdictions look to state and local law to provide a basis for taking other circumstances into account. The case from the Court of Appeals of Kentucky Bell relies upon, Turner, 295 S.W.3d 123, is one such example.  Both cases address the circumstance of whether the tenant "cured" the violation of having a guest commit a criminal act on federally subsidized properties.

In Scarborough, a tenant in Section 8 housing[4] in Washington, D.C., was evicted after a police search turned up a shotgun, pistol, ammunition, and cartridges in her home.  890 A.2d at 252.  The tenant's boyfriend had used the shotgun the previous day to shoot and kill the tenant's cousin, who had

---

[4]     The federal government provides low-income individuals with Section 8 subsidies towards rent for properties owned by private individuals.  Section 8 leases contain a provision virtually identical to 42 U.S.C. § 1437d(l)(6) permitting evictions based on criminal activity, committed by the tenant, a member of the tenant's household, or a guest or other person under the tenant's control, that threatens the health, safety, or peaceful enjoyment of the premises by other tenants.  Therefore, the Scarborough court applied Rucker to Scarborough's case.  890 A.2d at 256.

arrived drunk at the home and who had started an altercation with the tenant. Id. The boyfriend was ultimately acquitted of the murder by reason of self-defense. Id. In the meantime, the tenant was served with a notice to quit that did not provide her with a 30-day opportunity to cure the violation, which was part of the District's Rental Housing Act. 890 A.2d at 252, 253. The tenant asserted she had no knowledge of the shotgun's presence in her apartment and had also barred her boyfriend from coming back to her unit. 890 A.2d at 257.

The tenant's violation was premised on the possession of the firearms, not on her boyfriend's act of killing her cousin; nevertheless, the District of Columbia Court of Appeals noted, "[I]t would be little comfort to fellow residents that a tenant who has endangered their safety by permitting criminal activity on the premises promises to refrain from doing so again. . . .[I]t seems implausible that the D.C. Council meant for either discrete (i.e., completed) or continuing criminal activity to be 'correct[ible]' upon such assurances before eviction may be sought." 890 A.2d at 254.

The court then turned to Rucker and noted that, while "termination of a tenancy after criminal activity is not automatic under federal law," providing an opportunity to cure violations "dangerously criminal in nature . . . would substitute for the landlord's discretion a mandatory second-

strike opportunity for a tenant to stay eviction by discontinuing, or not repeating, the criminal act during the thirty days following notice."  890 A.2d at 257.  The court characterized the tenant's "cure" as follows: "[A]n assurance by the tenant that the chief wrongdoer has been barred from the premises is the sort of promise not to repeat that, because it is as easily broken as made, would undermine the federal objective" of controlling crime on federally subsidized property.  890 A.2d at 257-58.  Thus, the court held, "[W]e do not agree that HUD intended a mandatory cure opportunity to somehow complement a landlord's statutory right to evict for criminal behavior that threatens the safety of other residents." 890 A.2d at 258.

Lastly, the Scarborough court rejected the argument that "even when criminal activity has been found to provide a sufficient basis for eviction, a court may nonetheless review the landlord's exercise of discretion to seek lease termination."  Id.  The court pointed to Rucker's statement that a housing provider "may" consider all of the circumstances relevant to a particular eviction to hold that a Section 8 landlord was not "require[d]" to do so.  890 A.2d at 259.  The District of Columbia Court of Appeals thus affirmed the trial court's judgment of possession in favor of the landlord and against the tenant.  Id.

To the contrary is Turner, 295 S.W.3d 123, 128.  In that case, the Court of Appeals of Kentucky held that a public housing tenant had a right to cure a violation of her lease premised on the drug possession of her periodic guest, her nephew.  295 S.W.3d at 124.  The tenant had no knowledge of drugs in her apartment and did not know that her nephew had been arrested until she received an eviction notice.  Id.  The tenant then "informed [her nephew] to stay away from her apartment and [her nephew] had not returned."  Id.  The district court dismissed the public housing authority's eviction action, finding that the tenant had "sufficiently remedied the drug-related criminal activity, engaged in by [her nephew], by barring him from her apartment."  295 S.W.3d at 124-25.  The circuit court affirmed the district court, and the Court of Appeals of Kentucky affirmed the circuit court.  295 S.W.3d at 125.

In Turner, the tenant's lease contained the federally mandated provision regarding criminal activity and drug-related criminal activity (42 U.S.C. § 1437d(l)(6)), but it also incorporated the Kentucky landlord-tenant code into its provisions regarding evictions for those kinds of violations.  295 S.W.3d at 125.  One of the landlord-tenant code provisions allowed tenants the opportunity to remedy a breach of the lease.  Id.  Turner looked to Rucker and quoted it for the following:

30

> [42 U.S.C. § 1437d(l)(6)] does not *require* the eviction of any tenant who violated the lease provision. Instead, it entrusts that decision to the local public housing authorities, who are in the best position to take account of, among other things, the degree to which the housing project suffers from "rampant drug-related or violent crime," "the seriousness of the offending action," and "the extent to which the leaseholder has . . . taken all reasonable steps to prevent or mitigate the offending action."

Turner, 295 S.W.3d at 126 (quoting Rucker, 535 U.S. at 134) (citations omitted). The Turner Court also quoted HUD Secretary Mel Martinez's letter to all public housing authorities after the Rucker decision, urging them to be "guided by compassion and common sense." 295 S.W.3d at 126. The Turner Court then held that Rucker "expressly left discretion to the states and local authorities . . . to consider 'the extent to which the leaseholder has . . . taken all reasonable steps to prevent or mitigate the offending action,'" which would include whether the tenant cured her violation by forbidding her nephew from returning to her unit. 295 S.W.2d at 127-28. The Court of Appeals therefore concluded that the district court's finding that the tenant's violation was cured was supported by substantial evidence. 295 S.W.2d at 128.

As the parties note, there are no Hawai'i appellate cases bearing on the issue of whether and how a public housing tenant may cure a "criminal activity" violation of her rental agreement. Instead, this court's fairly recent Kolio decision speaks only to whether a tenant's action even constitutes

31

"criminal activity threatening the health, safety, and peaceful enjoyment of housing residents" and whether the HPHA abuses its discretion in making that determination.  135 Hawai'i at 274, 349 P.3d at 381.

Kolio also held, however, that the Board's eviction decisions are discretionary and therefore subject to review for an "abuse of discretion" and/or "arbitrary and capricious" action.  135 Hawai'i at 271-72, 349 P.3d at 378-79 ("[I]t was within the Eviction Board's delegated authority to determine whether [a tenant has] violated the Rental Agreement and to evict [a tenant] based on its conclusion that [the tenant has violated the Rental Agreement]; therefore, this court may "consider whether the Eviction Board nonetheless abused its discretion by making a determination that was arbitrary or capricious" under HRS § 91-14(g)(6).).

We did acknowledge that "[a]lthough HPHA is given discretion to determine whether grounds for eviction exist, this discretion is not unlimited."  135 Hawai'i at 272, 349 P.3d at 379.  We further noted, however, that "even though HPHA has an important interest in maintaining the peace and safety of the projects, HPHA must abide by the rules and provisions that create the boundaries of its discretion, especially where the consequences of its actions [i.e., eviction of a tenant] are so dire."  Id.

Granted, in <u>Kolio</u>, we held that the HPHA abused its discretion in evicting a tenant for "threatening the health, safety, or peaceful enjoyment of the housing residents" based on the tenant's theft of tenant association funds, because HPHA had not carried its burden of showing that any of the residents felt that their health, safety, or peaceful enjoyment of the premises was actually threatened by the theft. 135 Hawai'i at 268, 274, 349 P.3d at 375, 381. Although <u>Kolio</u> is therefore distinguishable because the HPHA did not establish that Kolio's theft was a violation of the rental agreement in the first place, the opinion is still relevant in demonstrating how the Board similarly did not demonstrate how Bell had not cured her violation.

In Bell's case, the Board appeared intent on re-adopting its order of eviction. First, it stated that "Paragraph 19(b) of the RA <u>requires</u> management to seek immediate termination of the rental agreement following certain types of violations, including Tenant's violation in this matter." While this is what Paragraph 19(b) states, that paragraph was not included in the parties' stipulation. Instead, the stipulation included Paragraph 19(a)(1)(iii), which stated, "Grounds for termination of rental agreement. Management <u>may</u> terminate the rental agreement only for: Serious or repeated violation of material

terms of the Rental Agreement, such as: Failure to fulfill Tenant's obligations under this Rental Agreement."

We acknowledge that HPHA here did immediately seek termination of Bell's rental agreement under Paragraph 19(b), but Paragraph 19(a)(1)(iii) suggests that HPHA nevertheless retained discretion to ultimately terminate Bell's lease, and for serious violations of the rental agreement.  This discretion is consistent with <u>Rucker</u>'s statement that a public housing authority is <u>not required</u> to evict a tenant for a violation of the criminal activity provision.  See <u>Rucker</u>, 535 U.S. at 133-34 ("The statute does not *require* the eviction of a tenant who violated the lease provision.").

Next, the Board went on to conclude that it had the discretion to decide whether Lambert's departure "cured" Bell's violations of the rental agreement, and it concluded it had not, ruling:

> 9.  On the question of whether Tenant successfully cured her violation, the Board concludes that Tenant's removal of Lambert from the property shortly after the violation did not amount to a cure or remedy of the rental agreement violation(s) for which Tenant was ultimately ordered evicted.  The violation of the RA includes Lambert's unauthorized entry in Aaron George's ("George") unit and physical assault of George which resulted in severe physical injuries to George.  The only way that the result of Lambert's actions could have been cured or remedied would have been for Lambert to "un-enter" George's unit and to "un-assault" George, both factual impossibilities.  Had the violation merely encompassed Lambert's unauthorized presence on the property, then Tenant's removal of Lambert would have been the cure to such violation.  However, Tenant's removal of Lambert from the property has done nothing and could not have done anything to cure or remedy

> his unauthorized entry of George's unit or his physical
> assault of George or George's severe physical injuries.

Under Rucker, local public housing authorities may, but are not required, to exercise discretion in evictions for criminal activity violations.  535 U.S. at 133-34.  After affirmatively announcing it would exercise its discretion to examine the circumstances of the case, however, the Board did not consider all of the factors set forth in Rucker: "'the degree to which the housing project suffers from 'rampant drug-related or violent crime,' 'the seriousness of the offending action,' and 'the extent to which the leaseholder has . . . taken all reasonable steps to prevent or mitigate the offending action.'" Rucker, 535 U.S. at 134.

First, the Board did not make any findings about "rampant . . . violent crime" at Hale Laulima, and HPHA had presented none. Next, the Board seemed to address "the seriousness of the offending action," but it erroneously focused on Lambert's attack upon George:

> The violation of the RA includes Lambert's unauthorized
> entry in Aaron George's ("George") unit and physical
> assault of George which resulted in severe physical
> injuries to George.  The only way that the result of
> Lambert's actions could have been cured or remedied would
> have been for Lambert to "un-enter" George's unit and to
> "un-assault" George, both factual impossibilities.  Had the
> violation merely encompassed Lambert's unauthorized
> presence on the property, then Tenant's removal of Lambert
> would have been the cure to such violation.  However,
> Tenant's removal of Lambert from the property has done
> nothing and could not have done anything to cure or remedy
> his unauthorized entry of George's unit or his physical
> assault of George or George's severe physical injuries.

35

Instead, the violation was Bell's in having had Lambert upon the property and for being responsible for his criminal conduct. Lambert is not a party to Bell's rental agreement. Therefore, Lambert's direct acts of unlawfully entering George's property and assaulting George are not the violations of the rental agreement that needed curing.

Lastly, the Board only touched on Rucker's consideration of "the extent to which the leaseholder has . . . taken all reasonable steps to prevent or mitigate the offending action," 535 U.S. at 134, in concluding that "[t]he only way that the result of Lambert's actions could have been cured or remedied would have been for Lambert to 'un-enter' George's unit and to 'un-assault' George, both factual impossibilities." Under Rucker, however, "mitigation" of damage already done could be considered where, as here, "prevention" of a completed act is no longer possible. The Board did not address mitigation when it stated, "Tenant's removal of Lambert from the property has done nothing and could not have done anything to cure or remedy his unauthorized entry of George's unit or his physical assault upon George or George's severe physical injuries." Therefore, the circuit court was correct in ruling that the Board erred in determining that Bell's violations were implicitly non-curable, or, if they were curable, that Bell's act of permanently barring

Lambert from Hale Laulima within 24 hours did not cure the violations.

In addition, the parties here stipulated that the remand hearing regarding whether Bell's violation was curable and whether it had been cured would be governed by the ACOP. In this regard, we disagree with the circuit court's initial conclusion that Bell's violation was the seventh type of ACOP violation (one that <u>potentially</u> threatens the health or safety of other residents). Bell's failure to foresee or stop her guest's conduct resulted in the actual assault of her neighbor; Bell's violation arose after the point of potentiality had passed. In other words, completed criminal conduct is generally not preventable, and therefore not curable, under the ACOP's seventh category, which deals with potential threats.

We agree with the circuit court's alternative conclusion that Bell's violation was the ninth type of ACOP violation ("any other violation"). We agree with the circuit court that Bell cured the violation as quickly as she possibly could have when she immediately and permanently barred Lambert from re-entering Hale Laulima. Thus, the Board erred in concluding that the only way Bell could cure her violation was to undo the assault. We agree with the circuit court that the Board (and HPHA) had not carried the burden of proving that a deviation from the 30-day cure period to zero days was justified. There was no discussion

37

in the Board's order concerning a deviation from 30 days to 0 days.  The Board's decision to treat Bell's violations as implicitly non-curable was arbitrary and capricious.

Therefore, the circuit court properly ruled that the Board erred, abused its discretion, and acted arbitrarily and capriciously in evicting Bell on the basis that her act of immediately and permanently barring Lambert from Hale Laulima could not, and did not, cure the violations of her rental agreement.

## V. Conclusion

For the foregoing reasons, the circuit court's final judgment is affirmed.

Klemen Urbanc                      /s/ Mark E. Recktenwald
For appellee-appellant
                                   /s/ Sabrina S. McKenna
Cynthia R. Moore
for appellant-appellee             /s/ Todd W. Eddins

                                   /s/ Lisa M. Ginoza

                                   /s/ Vladimir P. Devens

